Jones, Judge,
delivered the opinion of the court:
This is one of several suits that were brought by the different contractors for alleged excess costs incurred in carrying out their respective contracts for the construction of locks and dams for the improvement of navigation on the Mississippi River and its tributaries. .
The act conferring general jurisdiction ,on the Court of Claims was broadened for these particular cases by a special jurisdictional act approved July 23, 1937, which is set out in full in finding number 2 of the Special Findings of Fact and will not be repeated here:: ■
The bid of Nolan Bros., in response to public advertisement and invitation for bids to- furnish all plant, labor, and materials and perform all work required for the construction of Lock No. 7 near La Crosse, Wisconsin, was accepted and contract was executed November 16,1933.
The original contract price .was approximately $1,319,989. The work was to be completed within 365 calendar days after receipt of notice to proceed, The contract provided for liquidated damages in the sum of $250 per day for each day’s delay beyond the date fixed for completion until the work should be placed in safe and practical operating condition, and thereafter $25 per day as liquidated damages for each additional day’s delay in final .completion. Certain change orders were issued and the contract price and time of completion adjusted accordingly. The work was completed within the time specified and was accepted as satisfactory.
The contract covered one of-a. series of projects generally known as.P. W. A. projects, authorized by the Federal Emergency Administration of Public Works, the latter being organized under the provisions of' the National Industrial Recovery Act of June 16,1933 (48 Stat. 195).
*79 Formal notice to proceed was given on February 5, 1934, but plaintiff had previously been informed that it was the low bidder and would probably be awarded the contract, and with the permission of the officials in charge did some preliminary work prior to that date.
Prior to making its bid plaintiff received from the defendant, together with bidding schedule, form of contract, and specifications, Bulletin No. 51 of the Federal Emergency Administration of Public Works, dated September 7, 1933, which contained the following language:
Sec. 10. Employers may use organized or unorganized labor. Unorganized labor shall be .obtained from local employment agencies designated by the United States Employment Service, * * *. See Form P. W. A. 51, Article 19 (b) * * *
It had also received District Engineer Form No. 1 P. W. A., containing Circular Letter (Finance No. 150) dated September 13,1933, which contained the following provision:
* * * Contractors with existing organizations may take an existing skeleton organization of .keymen, including foremen to new work under National industrial [Recovery Act, but the remainder of the force for the work must meet the requirements of Article 19. (b) of Government Form P. W. A. 51 and of Section 10 of P. W. A. Bulletin 51.
Plaintiff brought to the project from its own organization certain administrative officials and employees, as well as certain keymen to be used as foremen. Labor generally was to be obtained through the National Reemployment Service from La Crosse County, Wisconsin, and Winona County, Minnesota, and if sufficient qualified labor was not thus obtainable, then from these states at large and, if necessary, from other states.
Plaintiff alleges several grounds of complaint as a basis for its first claim. It says that defendant failed to furnish lists of qualified woi'kmen in accordance with the terms of the contract and compelled it to use men who were not experienced or skilled in heavy construction work; that it repeatedly refused to permit plaintiff to bring in available men whom it knew to be qualified and experienced in this type of *80 work; that it made restrictive rules and regulations not contemplated by 'and not authorized by the contract and misinterpreted and misapplied other regulations, and by the issuance of such unreasonable regulations and the misinterpretation and misapplication of others greatly increased the cost of construction. Plaintiff’s first claim is for excess costs, damages, and expenses amounting to $280,927.89. Its second claim is for $78,940.29, making a total of $859,868.18, for which plaintiff sues.
Defendant answers that it was not obligated by the contract to furnish qualified labor, but was only required to furnish groups of men from which plaintiff could make its own selection; that the furnishing of lists was not insisted upon by the plaintiff; that the restrictive rules and regulations which were issued were reasonable; that the plaintiff was permitted to bring in such essential keymen, administrative officers, and foremen as the contract contemplated, and that -the plaintiff, therefore, is not entitled to recover on its first claim.
The general method used by the National Reemployment Service was to accept applications, have applicants make a statement as to their experience, make out a card and send the applicants over with the card, thus permitting plaintiff to make its own selection from the group furnished.
The area in which the work was done was largely an agricultural section, with one or two small cities that had some industrial activity.
In response to plaintiff’s call for labor, the La Crosse Reemployment Office sent groups of men to the project. Some of them were experienced and able to perform the work required; many others were neither qualified nor physically able to do the required work. Many of the workers were inexperienced in the handling of tools and wholly without experience in heavy construction work. Many had no tools and did not know how to handle or care for them. Some had only tennis shoes, which were wholly unsuited to heavy construction work. Consequently there were numerous foot injuries. Some of the men sent out as skilled workers were not trained in handling cranes, overturning six of them, within the first six months, seriously damaging them. Many *81 of the carpenters were inexperienced in reading the drawings or building forms and recesses and inserts for this type of work, thus causing loss of time and excess costs. At one time plaintiff asked permission to employ an experienced riveting crew which had formerly worked for him and which was then available. This permission was refused by the La Crosse office on the ground that riveters were available through the Eeemployment Service. Plaintiff took the crew sent out by the La Crosse office, but so much of the work was rejected by the Government inspector that the men were dropped at the end of the first day. Plaintiff again asked ■permission to use the experienced crew, but was again refused, and after a two days’ delay the La Crosse office sent down another crew from Milwaukee. Their work was also unsatisfactory and they were let go after .6 hours’ work. A large part of the work done by these men was rejected by the Government inspector and had to be done over. When plaintiff was laying derrick stone the men tipped a northwest crane boom backward twice in one day.
There was considerable unemployment in this section and among the men sent down were some clerks, a cripple with a wooden leg, a professor, a hairdresser, and a conductor. Some of the men who were sent down were good house carpenters and efficient as such, but inexperienced in heavy construction work. Difficulties were encountered in securing men who were qualified to operate the electric vibrators. Inexperienced men permitted them to become stalled or set in the concrete. Men would get stuck and have to be pulled out, leaving their boots in the concrete. On one occasion owing to the carelessness of the operator, two engines, traveling on a trestle in plain sight of each other, collided, in spite of the fact that warning signals were being given. Both engines were wrecked. A crane boom was broken twice in one day. The men’s lack of experience in this type of work greatly increased the costs of operation.
Before going into the other phases of the case we will take up the question of whether defendant was obligated, as contended by plaintiff, to send out only men who were qualified to do the work which was required; that is, to practically guarantee their qualifications. Applying the doctrine laid down *82 in Seeds and Derham v. The United States, 92 C. Cls. 97, 116, certiorari denied 312 U. S. 697, we hold that, according to the contract, defendant did not assume such obligation. Plaintiff was aware of the purposes for which the P. W. A. was-organized and the work laid out. The provisions of the law itself declared the purposes for which it was enacted. It-could not have expected in the circumstances to have a list of men fully qualified in every respect, but only labor of' such quality as might be expected when all the circumstances, as well as the purposes of the act, were taken into consideration. It was its duty under the contract to select the labor that it found qualified from the groups that were furnished by the National Reemployment Service. We do not hold that plaintiff was required to accept any labor that might be sent, regardless of whether it was qualified. Provision was made in the contract for additional groups to be sent from which the men might be selected, and further provision was made for permitting the securing of key and other skilled men in the event sufficient qualified men were not furnished by the Reemployment Service. The contract provided that these men could be brought in by the plaintiff, registered with the Reemployment Service, and then used on the job.
While endorsing the principle laid down in the Seeds and Derham case, supra, each case must stand on its own facts.. Whether a particular case falls fully within the principles, laid down in that case must be decided on the facts of such case as it arises. There is no doubt that in this particular case plaintiff had great difficulty in securing the necessary men who were experienced and qualified to' do the heavy construction work called for in this instance. The contract in the Seeds and Derham case was executed December 15,. 1935, two years after the contract in the instant case. Several provisions were different. Among other things, a new provision was inserted in the Seeds and Derham contract requiring the contractor to use not less than 90 percent relief labor, and the reference to defendant’s furnishing lists of' qualified labor was eliminated.
This brings us to other phases of the case which present-themseives in considering plaintiff’s effort to secure men who. could properly do the work, as well as the requirements,. *83 regulations and restrictions imposed by the defendant which, it claimed handicapped it in getting the work done.
It will be noted that the special jurisdictional act refers-to rules and regulations not contemplated by the contract and other rules and regulations which were misinterpreted in applying them to the conditions which plaintiff faced.
Both the House and Senate Committee reports on this bill made the following declaration:
Because of the extraordinary labor conditions surrounding these contracts and the novelty of the rules it seems that the Government misinterpreted the contracts and enforced some of the rules without regard to their proper purpose and in a way inconsistent with the tenor of the contracts. Generally speaking, these rules required the contractors to draw their labor personnel from the vicinity of the projects without regard to the fact that such vicinities were far from cities, sparsely settled, and did not have the skilled labor required for proper performance by the contractors. The contractors complied with these rules hut, it is alleged, in many cases had to duplicate the work done by the unskilled men provided by the Government at an excess cost to themselves and, as well, time lost in the training of the labor-provided lay the Government.
Among the restrictions placed upon the plaintiff by the-terms of the regulations imposed by the defendant was that it could not have more than one helper for each form carpenter, sometimes referred to as the 1-to-l rule. The evidence clearly shows that long prior and up to the time of the execution of the contract in question it had been the universal custom and practice among heavy construction contractors in that area to use as many as 4 helpers to each form carpenter. The evidence also indicates that the so-called 1-to-l rule was applied more often to house or building construction carpenters, the explanation for the difference being-that the nature of the work was entirely different; that the house carpenter builds more for permanence, expecting the-work to last many years; that he therefore finishes the joints- and other details with great care, having a just pride in his-work, -whereas the form carpenter constructs more for-strength and endurance, knowing that usually within two-- or three days his forms will be torn up, but that they must *84 bold while they are in service; that when the work is laid •out a great part of it can easily be done with helpers without anything like the direct supervision required on the more painstaking house carpenter work.
It is not necessary for the court to pass upon whether it was a wise labor policy, generally speaking, to have only one helper to each carpenter. These rules grow out of experience and their wisdom can better be determined by those who are skilled in the craft. But whether or not it would be wise to invoke the restrictions of the 1-to-l rule in this type of work generally, the fact remains that at the time plaintiff bid on this contract, it was given no notice of the possibility of the invoking of this rule. It naturally fixed the amount of its bid on the customs and practices that prevailed in this character of work up to that time. It seems to us that if plaintiff were to be subjected to the increased costs that such a rule, however wise, would occasion, it was entitled, under the terms of its contract, to be told in advance that such a rule was in contemplation, so that it might adjust its bid accordingly. Not having been so warned, we think that one of the purposes of the special jurisdictional act was to compensate plaintiff for the additional costs that would undoubtedly have been included in its bid had it known at the time of making it that it would be subjected to this restriction.
Another restriction placed upon plaintiff was that no helper could do any work unless at the time he was within the sight and hearing of the journeyman-carpenter. The gravamen of plaintiff’s complaint is that in heavy construction work this was a wholly impractical rule and that much of the time in this character of work the helper could do nothing at all. It cites one instance where a long rod was run through one of the construction forms. It was necessary for a nut to be tightened on the other end of the rod or bolt, and the helper was stopped because in tightening the nut he would be out of the sight of the journeyman-carpenter. Much evidence was offered to the effect that the rule was so wholly inapplicable to this kind of work that its enforcement made it impractical in most instances to use helpers at all and that consequently it reduced the number to only about half as many as the actual carpenters used; that in an *85 effort to extricate itself from these difficulties, plaintiff, in the absence of a sufficient number of skilled carpenters found it necessary, as soon as they had had a little experience, to advance helpers to the grade and pay of regular form carpenters, even though not fully qualified or experienced, and to lay off such helpers as showed no aptitude for the work. This caused another difficulty. When the regular qualified and experienced form carpenters found working alongside them men not fully qualified, who had not gone through the mill of experience and training, yet receiving the same rate of pay which they themselves received, they became discouraged. This lowered their morale and to some degree, at least, caused plaintiff to lose control of its organization and interfered materially with its efficiency.
Again, we do not undertake to pass upon the question of whether this was a wise rule, generally speaking, or whether it should be adopted generally in reference to heavy construction work. The fact remains that it was not in effect in this type of work prior to and at the time of the execution of the contract, and plaintiff had no notice thereof. It made its bid in the light of the customs and practices then prevailing. The increased costs thus incurred could not reasonably have been anticipated. We hold this in reference to the facts of this particular case only. If these two rules had been established prior to the time the contract was executed, or if plaintiff had been given notice in advance of the execution of the contract that defendant proposed to establish such rules, an entirely different question would be presented.
Plaintiff complains that on numerous occasions after men had been laid off on account of inefficiency or lack of training and inability to properly do the work, complaints were lodged with the Reemployment Office. When this occurred the respective foremen under whom the men worked would be called to a conference with the men discharged at which representatives of plaintiff, as well as a representative of the Reemployment Service, would be present. The pressure was great and plaintiff frequently tried the men out in other work, restoring and transferring one man three different times. The foremen were called away from their work for *86 .as long as an hour. One foreman was called off the work three times in one day. This left the men to work without the supervising foreman, and natura] ly interfered with the work of the project.
Conceding, in line with defendant’s contention, that the duty of selecting qualified men devolved upon plaintiff and that the defendant was under no obligation except to send over groups of men with their own statements as to their qualifications, the entire responsibility for making selections was thus placed upon the plaintiff. Having disclaimed all responsibility, the defendant should not have repeatedly interfered with plaintiff’s exercise of this responsibility and discretion. Its action in this regard undoubtedly increased the cost of performance. Again, we are not passing upon the right of the men to complain, nor of the wisdom of the practice generally of endeavoring to get an opportunity for the men whom plaintiff found wanting. But we have construed the contract in such a way that the entire responsibility for the selection of the men is placed upon the plaintiff. It seems that the defendant should bear the extra expense of this procedure, notwithstanding it may have been the just, wise, and humane thing to do'.
On several occasions, when plaintiff had difficulty in securing men of sufficient qualifications and experience to do the work, it asked the privilege of bringing in experienced men that it knew could do the essential work. In some of these instances these requests were granted and in others denied.
On July 21, 1934, the District Engineer, recognizing the difficulty contractors in this area were having in securing a sufficient number of skilled men, wrote the State Reemployment Director the following letter:
At the present time employment on lock and dam construction in this district is approximately at its peak. As a result, contractors have experienced, under present hiring methods, considerable difficulty in obtaining a sufficient number of skilled carpenters to prosecute the work. Although there are quite a few carpenters in the areas local to the work, a large number of them are not experienced on heavy construction.
The contracts provide that so far as practicable and feasible, labor for the projects shall be obtained through *87 the Reemployment Service. Since it appears that contractors are not obtaining, in every case, the type of skilled labor they are entitled to, it seems necessary to waive the provision requiring employment through the Reemployment Service and to permit the induction of carpenters skilled on heavy construction from outside the local area.
For this reason, therefore, I am granting permission to contractors to employ, from outside areas if necessary, a limited number of skilled carpenters, known to them as experienced in heavy construction, as keymen. All men so employed will be required to register at the Reemployment Agency designated for the particular project, so that you will be fully informed as to the extent to which this permission has been followed.
While the policy suggested by the District Engineer was in part complied with, it was not at all times followed.
After many difficulties in securing sufficient qualified labor to properly do the work, the District Engineer in response to a request from plaintiff that it be permitted to bring in an additional number of its own or other skilled employees, declined permission and stated that the plaintiff should use the men of this type already on the job to train additional skilled operators. We quote from this letter:
1. It is my opinion that the number of skilled employees exempt from the thirty-hour week as being in the supervisory class, now engaged on P. W. A. projects in this District, who have been permitted to come in to the jobs as key men, is at present sufficient to insure the safe and efficient operation of present equipment. Present personnel of the type described should be sufficient to train additional skilled operators obtained from local reemployment offices on the equipment now on hand or of equivalent type which may subsequently be brought to the work.
2. It will be the policy, therefore, to require that all additional operators for present equipment or equipment of equivalent type, be obtained from the Reemployment Agencies rather than to be brought in as key men, until such time as it is apparent that there is not sufficient competent local labor available to meet the demands of the various jobs.
Plaintiff complied with this request of the defendant to train the men otherwise lacking the necessary qualifications *88 so that there might be a sufficient number of qualified men. It proved helpful to both the plaintiff and the defendant, and the work progressed in better fashion after this training was done by plaintiff. However, we are unable to find any provision in the contract which placed upon the plaintiff the duty of training men in order to secure the necessary number of skilled men, and it hardly seems just that the plaintiff should be compelled to bear the expense of the training thus given.
The question of action by the Board of Labor Review on the subject of restrictive regulations is in a rather confused state. There is no evidence of record that the Board ever passed directly upon the question of such regulations. The evidence does show that at the request of the various contractors, including the plaintiff, who constructed locks and dams on the upper Mississippi River and its tributaries dur- ■ ing this period, the Board of Labor Review held a meeting at St. Paul on June 28, 1935. Plaintiff offered proof to the effect that the regulations complained of were called to the ■Board’s attention at that meeting and that the Chairman stated that the Board had no authority over the issuance of such regulations, but dealt only with cases. The evidence does not show that any official action was taken. The meeting was held after the instant contract was completed. Plaintiff’s representatives were present and participated in the meeting.
There is no proof of record of any further appeal to the Board of Labor Review on the subject of the regulations or of any further presentation of the facts to the Board. The record in this case is silent as to whether the Board of Labor Review ever officially passed upon the propriety of these regulations in any of the cases arising under the special jurisdictional act. In reality the issue in the peculiar facts and circumstances of this case was more a question of the interpretation of the contract than a labor dispute as such.
In this state of affairs the defendant contends that plaintiff failed to take the necessary steps to protect its rights. If this contention were accepted in full, plaintiff would have no more rights under the special jurisdictional act than it al *89 ready possessed under the general jurisdiction of the United States Court of Claims. To so hold would be in effect to declare that the Congress did a vain and futile thing when it enacted the special jurisdictional act. We are unwilling to judicially so hold. The special act was manifestly intended, within the limits therein set out, to provide a trial of the case on its merits.
This case arose at a time when the economic conditions in this country were at a low ebb. We had reached the end of an epoch. Business had grown greatly in previous years. Much more of it had become interstate in character and was operated on a larger scale. New methods were being employed. During the previous decade the Government had remained static. It had not kept pace with or shaped its policies to fit the new conditions. Collapse naturally followed. In order to meet this situation the National Industrial Recovery Act and many other acts were put into effect. Changes, too long delayed, were suddenly brought about, and old forms, outmoded and representing outworn creeds, were discarded. New practices were invoked to satisfy the new conditions.
Abrupt changes frequently produce hardships, even though such changes may be wise and necessary. Detours, which are often the sign of progress, temporarily cause difficulties. In passing from old to new methods honest though sometimes mistaken operators are involved in hardships through no fault of their own. This in our judgment is such a case. Congress evidently had in mind the correction of these unjust hardships that arose, however wise the new policies may have been, and accordingly enacted the special jurisdictional act in order to correct the individual wrongs involved in the processes of change.
Certain of the items of damage and excess costs have been very definitely and clearly proven. Others are incapable of exact determination. Plaintiff has submitted a great many figures and calculations which we are unable to accept in full, but which form a basis upon which a just verdict may be found, more or less in jury fashion. Other items of damage are not proven with any degree of definiteness and must therefore be eliminated.
*90 One cannot examine thoroughly the voluminous testimony and numerous documents in this case without being impressed with the fact that plaintiff operated under great difficulties; that.it was handicapped in many ways not contemplated by the contract, and was subjected to many hindrances which it could not reasonably have foreseen. Taking all these into consideration, we find that plaintiff’s excess costs which are proven with reasonable certainty and for which defendant is responsible, amount to at least $40,000 on this claim.
■ On the second claim there was an agreement and stipulation with .respect to the facts, and no evidence was introduced. Plaintiff had claimed a much larger amount, but in accordance with the agreement this claim was reduced to the amount set forth in the stipulation and it is practically conceded that the damages thus fixed were entirely the responsibility of the defendant. It was so agreed and the agreement is set out in finding 62.
Defendant now, while conceding its responsibility for these damages, nevertheless raises some technical objections to the entry of judgment. These objections are without substance or merit. Judgment will be entered on this phase in accordance with the stipulation in the amount of $16,994.62.
Plaintiff is entitled to recover in the total sum of $56,994.62. It is so ordered.
MaddeN, Judge.; Whitaker, Judge; LittletoN, Judge; and Whaley, Chief Justice, concur.