MaddeN, Judge,
delivered the opinion of the court:
Plaintiff’s suit-is based upon a contract dated October 5, 1933, made by it to construct for the defendant a dam known as dam No. 5 in the upper Mississippi Eiver, near the towns of Minneiska, Minnesota, and Fountain 'City, Wisconsin, and about 100 miles south of St. Paul, Minnesota. Those items of plaintiff’s claim related to flood damage, in the amount of $11,764.18, and excess cement required, in the amount of $1,811.91, are presented to the court under its general jurisdiction to give redress for breaches of contract. The major item of plaintiff’s claim, amounting to $154,224.30, is brought pursuant to a special jurisdictional Act, approved July 23, 1937, conferring upon this court jurisdiction to give relief to contractors who had constructed locks and dams on the Mississippi Eiver, for alleged excess costs incurred by them as a result of the promulgation and enforcement by the Government of labor regulations not contemplated by the parties when they made their contracts; the misinterpretation and wrongful administration of or failure to apply labor regula *543 tions which were embodied in the contracts; and the failure of the Government to supply qualified labor to work on the project. The text of the special Act is given in finding 2. Plaintiff also claims that, even without the special Act, the Government’s conduct in relation to the matters involved in the labor claim would have been breaches of contract cognizable by this court under its general jurisdiction. We shall first discuss the labor claim.
Plaintiff’s contract contained numerous provisions relating to the sources from which labor was to be obtained, the number of hours which employees might work, and the minimum wages which had to be paid for skilled, unskilled, and intermediate grades of work. These provisions are set out in findings 5 and 6.
The construction of the dam was authorized under the Eiver and Harbor Act of July 3,1930,[1] and it was a part of the approved program for public works under the National Industrial Recovery Act of June 16, 1933.[2] That Act appropriated several billions of dollars to be used in a nation wide construction program of what came to be known as Public Works Administration Projects, whose purpose was to rehabilitate industry and relieve unemployment, as well as to give the country the benefit of the public works which would be constructed. To insure a wide distribution of the employment which was thus to be furnished out of public funds, the Recovery Act provided that, subject to specified exceptions, persons directly employed on such projects should not be permitted to work more than 30 hours per week.
By an addendum to the invitation to bid, plaintiff and other prospective bidders on dam No. 5 were urged to read carefully Bulletin No. 51 of the Federal Emergency Administration of Public Works before submitting their bids. That Bulletin, the relevant part of which is quoted in finding 6, stated when exceptions would be made to the 30-hour week limitation. It provided that 130 hours of work in a month would be permitted “in localities where a sufficient amount of labor is not available in the immediate vicinity of the work,” and that 8 hours a day or up to 40 hours a week would *544 be permitted “on projects located at points so remote and inaccessible that camps or floating plant are necessary for the housing and boarding of all the labor employed.” But Bulletin 51 further provided “In case the contracting officer shall determine that any project falls within the terms of (b) or (c) hereof, he shall so state in the specifications submitted to bidders.” Since no such statement appeared in the specifications, the contract did not embody either of those exceptions to the 30-hour week maximum. This did not, we suppose, necessarily mean that conditions might not develop during the course of performance when the supply of labor might become so scarce, or by disaster the site of the work might become so inaccessible that, under Bulletin 51 or other provisions of the contract, the work week might have been extended. But for the contracting officer to have increased the work week without a new reason for doing so, when plaintiff had made its bid, as it must have done, on the assumption that the work week would be 30 hours, would have been improper. It would have been unfair to the Government, which was paying plaintiff extra compensation for the extra costs resulting from frequently changing shifts of workmen. It would have been unfair to other bidders, who would have bid lower if they had been assured of a longer work week.
Plaintiff was, upon its requests, granted special exceptions to the 30-hour week in many instances referred to in findings 35 to 38. For example on July 9, 1934, when work on this and other dam projects was at its peak and labor was, accordingly, scarce, plaintiff was given a change order permitting a 40-hour week within a 130-hour month until the completion of the contract. Even these limits were raised in many instances upon plaintiff’s request. We think plaintiff has no just cause for complaint because the short work week, which was an important part of the law which provided for the building of these dams, and which plaintiff contemplated when it bid for the work, was not abandoned to enable plaintiff to reduce its costs.
Plaintiff complains that, whereas the contract required the Government, through the National Reemployment Service, to furnish it qualified labor, that agency instead supplied *545 it with unqualified labor. Article 19 of the contract, which is quoted in finding 5, provided in subdivision (a) for preference (1) for citizens, and aliens who had declared their intentions, who are “bona fide residents of the political subdivisions and/or county in which the work is to be performed and (2) * * * for bona fide residents of the state.” The same article provided in subdivision (b) that “to the fullest extent possible, labor required for the project and appropriate to be secured through employment services, shall be chosen from lists of qualified workers submitted by local employment agencies designated by the United States Employment Service.” The preferences directed in subdivision (a) were to be observed, in securing labor through employment services.
The National Reemployment Service, an agency of the United States Employment Service, in September 1933, established an office at Winona, Minnesota, which was about 18 miles from the project. That office was designated as the office through which plaintiff’s labor was to be obtained. It was to serve plaintiff and other contractors constructing locks and dams in the area. The National Reemployment Service had offices with state-wide jurisdiction at St. Paul, Minnesota and Madison, Wisconsin. It also had a local office at Fountain City, Wisconsin, which was 8 miles from the site of the work.
Plaintiff complains that the N. R. S. office did not supply plaintiff with “lists” of qualified workers, or, for that matter, with any lists at all. But the reason was, that at the beginning of plaintiff’s work, it began the practice of telephoning to the N. R. S. office at Winona and asking for men, in order to get prompt service. The office then went through its registration cards, selected men who seemed to be qualified, called them in and gave them cards of introduction and reference to plaintiff. The men then applied to plaintiff, were interviewed, and such of them as plaintiff wanted were hired. Plaintiff endorsed the cards of those it hired and returned the cards to N. R. S. N. R. S. at the end of the week made up a list showing the names, residences, and occupations of the men referred by it and hired by plaintiff, and sent plaintiff the list. Beginning in November 1933, plain *546 tiff, in addition to telephoning its requests for labor, sent form No. 104 confirming in writing its telephoned requests. Plaintiff never asked for “lists” of workers, never indicated in any way that it wanted them, and offered no proof that it would have been better off with such lists than without them. There is no evidence or claim that N. R. S. discriminated against plaintiff or failed to fairly apportion the labor supply to the demand of the contractors who used the service. ' ,
We consider now plaintiff’s claim that N. It. S. failed to supply it with qualified workers. By the express provisions of the contract, and one of the prime purposes of the Recovery Act, local residents were to have preference. Both the geography of the region and a trip of investigation made by plaintiff’s representative before bidding on the contract, disclosed to plaintiff what the labor situation would be. The available common labor would be farmers and small townsmen, who had never worked on a heavy construction job. The carpenters would be experienced in building houses and barns, rather than forms for setting concrete. Workmen of other trades would, on the whole, have had similarly limited experience. In comparison with the rough» and ready “jack of all trades” type of construction gang labor that plaintiff had been accustomed to use when the only object was to get the job well done with the greatest speed and the least expenditure possible, this rural labor was green and awkward, and required some breaking in. But was it “unqualified” to do this work, as plaintiff should reasonably have understood the word “qualified” as used in the contract? If it was, the purpose of the Recovery Act and of Article 19 of the contract, to give employment in communities where men had their' homes, was nullified. A farmer, strong and intelligent, who lived adjacent to the project could not get a job, paid for by his Government, as a common laborer, because he had never had a concrete vibrator in his hands before and would have to learn how it worked, just as he had learned how to harness a horse or operate a corn cultivator. A carpenter who had built houses and barns would be passed over because he,would be inclined, out of habit, to put more nails in temporary forms than were necessary, and would have to *547 be told how to do it differently. There is no evidence that the communities from which labor was sent to plaintiff were below the average of American communities or, that the general run of individuals who applied for plaintiff’s jobs, and were interviewed and hired by plaintiff, were below the average of their communities. Particular individuals were, no doubt, unqualified, as they would have been if they had been hired from any source other than a pool of recent former employees of plaintiff. But the contract, for valid reasons, did not permit plaintiff to recruit its labor from that limited source, and plaintiff has no right to complain that it was not permitted to do what it had agreed not to do.
Plaintiff compares its workmen on this job with the ideal construction gang. But the restriction of the work week to 30 hours would have made it impossible to get ideal help on this job, except at much higher wages than plaintiff paid these local workmen. Few persons “qualified”, as plaintiff would define that word, would have found it necessary to go so far and pay board in plaintiff’s camp for so little work as 30 hours a week. But even if plaintiff could have recruited such an ideal gang, it had no right to do so, in the face of its promise to give preference to local residents who were qualified. That important restriction on plaintiff’s freedom of hiring was not put in merely to be nullified by being read as “ideally qualified”, or “qualified beyond what the parties, in the circumstances have any right to expect.”
We think that plaintiff was not, to any extent that it has proved, put to extra expense by reason of the Government’s failure to furnish qualified workmen.
Plaintiff complains that the Government would not allow it to require its employees to stay in the camp, so that they would be available for emergencies. We think that for plaintiff to refuse to hire a farmer as a laborer, because, after his short day’s work, he wanted to do his chores and be with his family would have been a contradiction of the preference for local labor required by the Recovery Act and by the contract.
Plaintiff was treated with great consideration in regard to bringing in supervisors and keymen to tone up the labor force, especially during the early period of construction *548 when the local labor was still green and inexperienced. Many men known to and invited by plaintiff came and registered at the N. R. S. office and were sent to and employed by plaintiff.
Plaintiff complains that the Government enforced rules which were not embodied in the contract. One instance alleged is that the N. R. S. refused to require applicants from distant points, such as St. Paul, to travel to the site of the job for interviews as to jobs which were to become available in the future. We think the N. E. S. was entirely reasonable in this position. We think that if plaintiff desired to have preliminary interviews with workmen from St. Paul before even giving them a trial on the job, it should have sent an agent to St. Paul for the interview, rather than requiring the workmen to travel so far at their own expense for nothing more than an interview.
Another kind of alleged enforcement of rules inconsistent with the contract is that nonworking foremen were told, on several occasions, that if they worked or used tools, they must be limited to 30 hours a week. Plaintiff says that the contract did not forbid foremen from using tools. But it did provide that those laboring on the project should be limited to 30 hours a week; And it has been necessary, on other projects if not on this, to draw a strict line between working and nonworking foremen in order to prevent evasion of the 30-hour week restriction. It may be that in the instances which plaintiff cites, it would 'have been sensible for the inspectors to have overlooked the fact that a nonworking foreman used a tool. But one who has agreed to abide by a regulation can hardly claim that he is legally damaged by its strict enforcement. Besides, we are furnished no evidence as to what, if anything, the enforcement of the regulation cost plaintiff.
Another principal element in plaintiff’s claim that labor regulations not contemplated by the contract were imposed upon it, was the so-called “one to one” rule. This rule required that the total number of helpers in any craft should not exceed the number of journeymen or skilled workers in that craft. The facts, as we have found them, relating to this problem,, appear in findings 38 to 53. The reason for the imposition of the one to one. rule upon all public works proj *549 ects was that during the early part of 1934 complaints were received by the War Department and the Board of Labor Review of the Federal Emergency Administration of Public Works that contractors were violating their contracts in regard to the classification of workmen, by classifying skilled workmen as semiskilled and thus paying them lower rates. Plaintiff, like other contractors, had agreed to a scale of minimum wages for skilled, unskilled, and semiskilled workmen. This agreement did not contemplate that the wages of a particular workman could be arbitrarily set by plaintiff merely by assigning to him, on the pay roll, a certain status. It meant that he should be assigned, on the pay roll, the classification to which the work which he actually did entitled him. And it meant that the defendant, being a party to the contract, would properly have something to say about whether the classification assigned was correct or not. We think that for the defendant, out of its experience on this and other contracts, to generalize its position with regard to the number of workmen who could properly be classified as helpers, by saying that they should not exceed the number of skilled craftsmen whom they were supposed to be helping, was not unreasonable. In this way both the contractors and the Government could be sure, without constant and minute inspection, that the contracts were not being seriously violated. In this case, although the contract work had been going on for most of a year when plaintiff wrote the contracting officer on September 15,1934, yet plaintiff said, about this regulation, “In our particular case no present hardship will be worked upon us, but should there arise a condition where, this ruling would work a hardship on us, we would expect to be paid the additional costs incurred.” The enforcement of the “one to one” rule was delayed long after the order of August 20, 1934, which promulgated the rule, while the negotiations with regard to an appeal to the Board of Labor Review, recited in findings 46 to 53, were being carried on. In the meantime plaintiff seems to have complied with the requirements of the rule, though the operation of the rule was suspended. Plaintiff has not, however, shown to what éxtent it reorganized its working force because of the promulgation of the rule, or at what additional cost. As to car *550 penters, wbo comprised a large proportion of the skilled workmen on the job, the tule had no effect, since the proportion of helpers was always much smaller than one to one. There is some evidence that a skilled pipe fitter was added, because of the rule, to a gang that had formerly consisted of one skilled man and two helpers. As to how many gangs this change applied to, and for how long, we do not know. The testimony suggests that the added man was completely wasted, but does not say that he did no work, or that there was nothing useful for him to do, which would have minimized the loss. In this state of the record, of course^ no recovery could be allowed, even if we thought that the one to one rule was impropei’ly promulgated.
Flood Damage
Findings 55 to 64 relate to this item of plaintiff’s claim. Plaintiff, in order to get materials to the site of the work, built a spur track on the Wisconsin side of the river, from themain line of the Chicago, Burlington and Quincy Railroad to the site of the dam. This spur track crossed about two miles of flood plain, including several sloughs, the largest of which is called Indian Creek. A part of the track was built below the level of the flood stages shown on the hydrographs which were furnished plaintiff before it bid. Fourteen times since 1910 floods had reached stages higher than the level of the track. The contracting officer notified plaintiff that the track was too low, and that the four 80-inch culverts in it were not sufficient to let the water through the track embankment. Plaintiff replied that it would breach the embankment if a flood came which required it.
In connection with dam 5, which was the subject of plaintiff’s contract, the Government caused to be built an earth dike, extending upstream about three and one-half miles from the abutment of the dam on the Wisconsin side, and parallel with the river, to high ground. The contracts for the dike and the dam were let at about the same time and the two jobs proceeded simultaneously. Indian Creek opened into the river about a mile and a half above the dam, and also at some point below the dam. There had been a rock and brush dam across the upper opening of Indian Creek for some time past, *551 to prevent the water of the river in ordinary stages from being dissipated into the slough. This dam was not high enough to prevent the river, in flood stages, from overflowing into the slough. The dike contractor obtained permission from the Government to breach the rock and brush dam and substitute for it a temporary earth dam at a location on Indian Creek, where it would serve the same purpose but would not interfere, as the rock and brush dam did, with the construction of the new permanent dike.
As shown in finding 59, a flood came in early April 1934, which rose to a level about 6 feet higher than that of the old rock and brush dam. The new temporary earth dam washed out, and also a considerable segment of the embankment of plaintiff’s spur track. Plaintiff, on the day after these events, wrote the contracting officer requesting an extension of time for completion on account of unforeseeable difficulties caused by the flood, but made no claim that the destruction of its track was due to any fault of the Government. Not until a month later did it make this claim, and then it attributed the damage, to a considerable extent, to the fact that the gate of the lock on the Minnesota end of the dam was kept closed. In fact, the lock had not been completed to the point where the gate could have been opened without serious damage to the structure.
Whether plaintiff’s track would have washed out if the temporary dam which the Government caused to be built had not washed out, we can only guess. The flood was such that it overtopped both the track and the dam before either washed out. The dam was a mile and a half from track, and the course of the slough between the two was wide and full of trees and brush. Thus any sudden rush of water through the breach in the dam would probably have spent itself in the waters which covered and surrounded it before it reached plaintiff’s track. Plaintiff did not breach the track embankment, which it had said that it would have to do to save the embankment if a flood came. The whole course of events does not persuade us, as plaintiff has the burden of doing, that the washing out of the temporary dam was the cause of the damage to plaintiff’s track. It is not, therefore, necessary for us to decide whether the Government’s permit *552 ting the dike contractor to replace the rock and brush dam with a temporary earth dam created an obligation on the part of the Government, to plaintiff, that the earth dam would withstand a flood.
Excess Cement
The facts relating to plaintiff’s claim for the cost of excess cement required are stated in findings 65 to 72. In brief, plaintiff’s contention is that the contracting officer required plaintiff to add cement to the concrete mixture in order to produce greater uniformity of surface texture; that, under the contract, plaintiff was under no obligation to produce the kind of surface texture which the contracting officer was insisting on; and that therefore the cement required for this purpose was in addition to the requirements of the contract and should be paid for in addition to the contract price.
The contracting officer’s letter of April 10, 1934, which is quoted in finding 66, referred to nonuniformity of surface texture as an indication of inadequacy of workability, which was one of the qualities of concrete required by Sections 5-01 and 5-13 (b) of the specifications. There is no reason to suppose that that letter was not written in good faith. If it had not been, it would not have mentioned, in its first paragraph, the matter of “uniformity of surface texture,” which laid it open to plaintiff’s claim here that the contracting officer was requiring something not called for by the contract. We therefore assume, as we must, in the absence of any reason for not doing so, that the contracting officer was requiring added cement in order to obtain what he regarded as proper workability. Section 5-13 (b) of the specifications was as follows:
The exact proportions of all materials entering into the concrete shall be as directed by the contracting officer. The contractor shall provide all equipment necessary to positively determine and control the actual amounts of all materials entering into the concrete. The proportions will be changed whenever, in the opinion of the contracting officer, such change becomes necessary to obtain the specified strength and the desired density, uniformity, and workability, and the contractor will not be compensated because of such changes.
In addition to the quality of strength, which could be definitely tested by crushing sample cylinders of the concrete, the *553 other agreed qualities of density, uniformity, and workability were qualities as to which persons, even experts, might differ in their opinions. But the quoted section of the specifications lodged the power of decision as to these matters in the contracting officer, and did so in the most unmistakable language. The contracting officer made his decision. It was appealed by plaintiff to the Chief of Engineers, who was at first inclined to reverse the decision of the contracting officer, but who, after a fuller explanation by the contracting officer, denied plaintiff’s claim. In these circumstances, we have no reason to substitute our opinion concerning this concrete for the opinion which, according to plaintiff’s contract, was to be controlling.
Plaintiff’s petition will be dismissed. It is so ordered.
Whitaker, Judge; LittletoN, Judge; and Whalet, Chief Justice, concur.
JoNes, Judge, took no part in the decision of this case.

 48 Stat. 195.