ADDISON MILLER, Inc., et al. v. UNITED STATES.

No. 44664.

Court of Claims.

April 7, 1947.

Karl H. Michelet, of Washington, D. C. (Simon Michelet and Wm. J. Hogan, Jr., both of Washington, D. C., on the brief), for plaintiffs.

John B. Miller, Asst. Atty. Gen., and John F. Sonnett, both of Washington, D. C. (Newell A. Clapp, of Chicago, Ill., on the brief), for defendant.

Before WHALEY, Chief Justice, and WHITAKER, MADDEN, JONES, and LITTLETON, Judges.

WHITAKER, Judge.

Plaintiffs had a contract for the construction of the spillway gate structure and the cut-off structure for the Fort Peck Dam in Montana. They sue under the Act of July 23, 1937, 50 Stat. 533, 28 U.S.C.A. § 250b, for excess costs alleged to have been incurred due to the causes mentioned in the Act.

The Act of July 23, 1937 gives this court jurisdiction of suits by contractors, who had contracts for the construction of locks and dams on the Mississippi River, on account of the promulgation of rules and regulations issued subsequent to the dates of the several contracts, which were inconsistent therewith, or which were misinterpreted and wrongfully enforced or which were disregarded, as a result of which the contractors were deprived of normal control over their personnel. It also gives this court jurisdiction of suits by such contractors for excess costs incurred as a result of the Government's having failed "to supply qualified labor under the labor clauses of the respective contracts." The Act is quoted in full in the footnote below.[1]

The plaintiffs say, first, that the labor furnished by the defendant on this contract was not qualified to do the work for which

---

[1] AN ACT To confer jurisdiction on the Court of Claims to hear, determine, and enter judgment upon the claims of contractors for excess costs incurred while constructing navigation dams and locks on the Mississippi River and its tributaries.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and enter judgments against the United States upon the claims of the several contractors for alleged excess costs incurred in the execution of their respective contracts, entered into since June 16, 1933, for the construction of locks and dams for the improvement of navigation on the Mississippi River and its tributaries, by reason of the Government having promulgated and enforced, as alleged, due, as alleged, to the national emergency and subsequent to the dates of the several contracts, rules and regulations referred to in the several contracts and misinterpreted and wrongfully enforced or disregarded, as alleged,

and rules and regulations not referred to in and inconsistent with the respective contracts, as alleged, which rules and regulations, the enforcement or disregard thereof, deprived the contractors of normal control of their personnel, as alleged, and further by reason of the Government having failed, as alleged, to supply qualified labor under the labor clauses of the respective contracts, resulting in excess costs, including general overhead and depreciation, to the said several contractors on their respective contracts, as alleged; the said judgment or decrees, if any, to be allowed notwithstanding the bars or defenses of any alleged settlement or adjustment heretofore made, res judicata, laches, or any provision of law to the contrary.

"This Act shall not be interpreted as raising any presumption or conclusion of fact or law but shall be held solely to provide for trial upon facts as may be alleged.

"Review of such judgment may be had by either party in the same manner as is provided by law in other cases in such court."

they were required; and, second, that defendant promulgated rules and regulations which denied to the contractors the right to secure their own labor for the job, under the circumstances in which they were permitted to do so under the terms of the contract, or that it failed to enforce its rules and regulations, which would have permitted them to secure their own labor for the job. They also say that they were deprived of legitimate control over the personnel furnished by the Government, in that their right to hire and to discharge the personnel furnished was unduly restricted.

Under article 19(a) of the contract the contractor was required in the employment of labor to give preference to ex-service men "where they are qualified," and then to give preference, first, to citizens of the political subdivision or county in which the work was to be performed, and then to citizens of the State within which the work was to be performed, but with the proviso: "that these preferences shall apply only where such labor is available and qualified to perform the work. * * *"

Article 19(b) provided in part: "To the fullest extent possible, labor required for the project and appropriate to be secured through employment services shall be chosen from the lists of qualified workers submitted by local employment agencies designated by the United States Employment Service," with the proviso that union labor might be secured through recognized union locals if available, otherwise, "from lists of qualified workers submitted by local agencies designated by the United States Employment Service."

This article was administered in the following way: Shortly after April 4, 1935, the date of the contract, the plaintiffs advised the National Reemployment Service at Glasgow, Montana, the agency designated by the United States Employment Service, of its prospective requirements for "skilled workers" and requested that they be authorized to secure these workers themselves if they were not available for reference by the National Reemployment Service (hereinafter referred to as the NRS). Also in February 1936 plaintiffs submitted to the NRS an outline of their estimated labor requirements for the 1936 working season, both of common labor and of skilled and semi-skilled labor. However, not until the NRS had received from plaintiffs specific requisitions for the various classes of workers needed with the specific dates given on which they would be needed did the NRS furnish plaintiffs with any lists.

There may be some question as to whether or not this was a sufficient compliance with the terms of the contract; however, plaintiffs did not complain of this practice, but acquiesced in it. By their conduct, therefore, the parties have interpreted or amended the contract accordingly.

1. Plaintiffs' first complaint is that the laborers so furnished were not "qualified," as they were required to be under the contract.

In support of this assertion plaintiffs rely almost wholly on what they say was the large percentage of those furnished who had to be fired for incompetency. They say that it was necessary for them to discharge for incompetency about 15 per cent of those referred. The defendant, however, produced a number of witnesses who testified that the laborers on this job were on the whole as competent as those found on any similar job. One of the witnesses introduced was the general superintendent for another contractor on a part of this project. He testified that the labor turnover on this job was not greater than was to be expected; in fact, he says, "It seems to me that is a very low figure for the number of men to be discharged for cause on a job of that kind."

Indeed, Mr. H. C. James, plaintiffs' general manager in charge of the work, in response to the question, "So far as you know, the labor you got from the NRS office was the average labor that came through the NRS office?" testified, "I would say that is probably so."

Under this testimony there can be no recovery on this ground.

In Seeds & Derham v. United States, 92 Ct.Cl. 97, 116, certiorari denied, 312 U.S. 697, 61 S.Ct. 731, 85 L.Ed. 1131, we said: "* * * We do not think that the Congress in the passage of the Act of July 23, 1937, intended to compensate a contractor for increased cost on account of

using relief roll labor, which he knew he would have to use, unless the efficiency of such labor was below what he had a right to expect from such a source. The Act gives the contractor the right to recover by reason of the failure of the government to supply 'qualified labor under the labor clauses of the respective contracts.' This does not mean the most highly qualified labor, nor labor of the qualifications that might be secured if the contractor were free to secure it from any source, but only labor of such qualifications as the contractor had a right to expect from the relief rolls."

We approved this holding in Nolan Bros., Inc., v. United States, 98 Ct.Cl. 41, and in Frazier-Davis Construction Co. v. United States, 100 Ct.Cl. 120, 160; and we arrived at the same conclusion in Merritt-Chapman & Whitney Corporation v. United States, 99 Ct.Cl. 490.

Under plaintiffs' own admission, therefore, the defendant has not failed to supply them with that character of labor which was called for in the Act.

This case is different from Nolan Bros. v. United States, supra. Some of the laborers referred in that case were wholly without qualification to do the work for which they were referred. Clerks were referred to do construction work, a crippled man with a wooden leg was referred, and a professor, a hairdresser, and a conductor. These men permitted the electric vibrators to become stalled and fastened in the concrete. The men themselves would get stuck in the concrete and would have to be pulled out. Two engines collided on a trestle. A crane boom was broken twice in one day. No such things appear in the case at bar.

2. Plaintiffs say that they were deprived of normal control over their personnel in these respects: (1) they were not permitted to reject for incompetency a laborer referred to them until they had first given him a trial, and then only with the consent of defendant's representatives on the job; (2) they were not given the right to employ their own personnel under the circumstances in which they were entitled to do so under the contract.

We do not think plaintiffs' first complaint, that they were not permitted to reject for incompetency a laborer until they had first given him a trial, and then only with the consent of the defendant's representative, is meritorious. The contract provided that plaintiffs should employ labor secured though the employment services "to the fullest extent possible." We do not think it was unreasonable for the defendant, in the enforcement of this provision of the contract, to require plaintiffs to at least give a trial to a man who claimed he had the qualifications to do the work and who was thought by the National Reemployment Service to have the necessary qualifications to do the work.

While defendant's rules did require that plaintiffs secure the assent of defendant's representatives on the job for the discharge of a laborer for incompetency, the proof points to no single instance in which this assent was not promptly given. Even if such a requirement went beyond the power conferred on defendant by the contract, still, it was not enforced in such a way as to deprive plaintiffs of their rightful control over their personnel.

This complaint we think is without merit.

There is more merit in plaintiffs' second contention, that they were not given the right to employ their own personnel under circumstances in which they were entitled to do so under the contract. Plaintiffs say, first, that the National Reemployment Service had a rule that the plaintiffs could supply their own labor, if the defendant was unable to supply it within 48 hours from the time it was requisitioned, but that this rule was disregarded and that authority was not given plaintiffs to employ their own labor until long thereafter. Irrespective of the 48-hour rule, plaintiffs also say that defendant refused to grant authorization to employ their own labor, notwithstanding its own inability to do so, within a reasonable time.

On November 29, 1933 the National Reemployment Service at Helena, Montana, addressed a reply to inquiries that had been received from its county managers, in

which it was stated: "The employer or a contractor cannot employ a man only in a supervisory capacity until he has first requisitioned your office in writing setting forther [sic] the number of men, the time work will start, and the type of work these men are to do, and if you cannot supply his demand within 48 hours after you have received this notice he may then employ his own men without referring to your list."

We have some doubt whether or not under the facts and circumstances surrounding the execution of plaintiffs' contract the defendant was under the obligation of permitting them to employ their own men if it was unable to furnish them within 48 hours from the time they were requisitioned. The Fort Peck Dam was located in a sparsely settled rural community in eastern Montana. The population of this State is 3.6 persons per square mile, as compared with 62 in Tennessee, 163 in Ohio, 491 in New Jersey, and 550 in Rhode Island. There were no large cities in the State. Great Falls, a city of something less than 30,000 population, and the only one of any size east of the Rockies, was about 300 miles away. The people of the State east of the Rockies were engaged principally in sheepherding, cattle raising, and farming.

The supply of the skilled and semi-skilled labor necessary on this job was exceedingly scarce, not only in the county in which the work was being performed, but also in the State as well; as well, indeed, as in the neighboring States of Idaho, Wyoming, and North and South Dakota. Only a very small part of the required labor could be secured in the county in which the work was being done, or even within the State of Montana. A great deal of it came from the Dakotas. Under the circumstances it would have been difficult, indeed, for the reemployment services to have furnished plaintiffs with laborers, even unskilled laborers, within 48 hours from the time they had been requested.

This project was one of those undertaken by the Public Works Administration, designed largely to relieve unemployment in the locality of the work. This was the reason for the requirement that preference should be given to citizens of the county, in which the work was to be done, and then to citizens of the State. The enforcement of the 48-hour rule would probably have defeated one of the very purposes of the construction of this dam at the time, to wit, relieving unemployment in the community. The NRS could not have gotten to the job within this time many of those for whose benefit the work was initiated. The enforcement of the 48-hour rule would thus have defeated one of the chief purposes of the project.

The defendant was under no contractual obligation to furnish the workers within that time. Plaintiffs were ignorant of this rule until the taking of testimony in this case.

However, defendant was certainly under the obligation of furnishing plaintiffs with the required labor within a reasonable time after it had been requisitioned, even though not within 48 hours, or if it could not do so, of permitting plaintiffs to get their own labor.

The findings show that in the year 1935 seventy-one percent of the labor requested reported within 4 days from the date they were requested, and eighty-nine percent reported within 6 days. In 1936 the record was not so good; forty-eight percent reported within 4 days, and sixty-seven percent within 6 days. In 1937 the record was much better; eighty-six percent reported within 4 days, and ninety-two percent within 6 days.

Nearly all of the requisitions called for the laborers to report "at once," but the findings show that parties understood that this meant at as early a date as practicable. A prudent contractor, of course, anticipated his needs as much as possible. It is to be presumed that these contractors did so and that they understood, especially in view of the location of the work, that there would be some delay between the date of requisition and the date the men reported. Under all the facts and circumstances we think that 6 days was a reasonable time within which these men should have reported. The findings show that in 1935 about 11 percent reported later than this; in 1936 thirty-three percent; and in 1937 eight percent. A few reported as much as 17 or 18 days after the date of the requi-

sition. In 1935 one hundred thirty-six (136) men reported more than six days after they had been requisitioned; in 1936, six hundred twenty-three (623) reported later than this; and in 1937, one hundred one (101) men.

We are of opinion that plaintiffs should have been authorized to employ their own men where defendant could not do so in six days. Although plaintiffs had requested authorizations to employ their own men, these requests were not granted until defendant had exhausted the possibility of its doing so, although some of its men did not report until fourteen days after requisition and a few not until the seventeenth or eighteenth day.

We think defendant should respond in damages for this delay in furnishing the men requested, or, in the alternative, in giving authorization for plaintiffs to employ themselves.

In another respect defendant was clearly to blame: Plaintiffs asked authorization to be permitted to employ 117 skilled and semi-skilled workers of their own choosing. This authorization was granted on the day requested in the case of 39 workers; on the following day in the case of 22; on the second day after the request, in the case of 10; on the third day, in the case of 3; and on the fourth day, in the case of 12; others on the fifth, sixth, seventh and eighth days. Eighteen men were authorized 9 days thereafter, and three not until the eleventh, fifteenth and sixteenth days. It seems to us that the defendant was obligated to give these authorizations not later than the second day after they had been requested, especially in view of the fact that defendant had had ample time within which to supply the men needed. Of the 117 men requested, authority was not given to employ 56 of them, or practically 50 per cent of the number requested, until more than 2 days after the request. We think defendant should respond in damages for whatever excess costs plaintiffs may have incurred by reason of this unjustified delay.

The difficulty, however, is that it is impossible to form any sort of estimate of the extent to which plaintiffs were damaged as a result of these delays.

Plaintiffs' claim, as we have said, was based upon a number of different complaints; the complaint that the labor furnished was not sufficiently qualified; that they were unduly restricted in their right to select those to be hired and in their right to discharge them; that the labor which was furnished was not furnished as quickly as it should have been; and that they were not given authorization to secure their own labor as soon as it should have been given. They undertake to show the extent to which they were damaged as a result of all of these things, without undertaking to show the amount of their damage as the result of each one of them.

They show that their estimate of what their fair and reasonable labor costs would be was $618,931.75, whereas, their actual labor costs were $1,058,810.81. They also show that the estimate of labor costs by the United States Engineers was $922,131.38, and that the composite estimates of other bidders on the job and that of the United States Engineers was $935,908.11, which was some 11 percent below plaintiffs' actual labor costs.

This does not give us sufficient basis to form an estimate of the amount of plaintiffs' excess labor costs as the result of all the things of which they complain, because the findings show they were delayed by a number of other things having no relation to defendant's labor regulations. They were delayed by another contractor, by their own inexperience in some of the work required to be done, by the defendant's faulty designs and by manufacturing defects in some of the articles furnished for the work. For the various delays, exclusive of the stoppage of the work during the winter, extensions of time of 286 days were given. All of these things necessarily increased plaintiffs' labor costs.

But, even if plaintiffs' proof were sufficient to show excess cost to which plaintiffs were put by reason of the defendant's administration of the labor provisions of the contract, still, we have no means of knowing how much of this increased cost was caused by the one thing of which plaintiffs complain or by the others. It would be the purest guess for us to say that the plaintiffs were damaged in any

certain sum as a result of defendant's failure to grant them authorization to employ their own men within a reasonable time.

Indeed, plaintiffs' chief complaint is the failure to furnish sufficiently qualified labor, and the failure to enforce the rule permitting the employment of plaintiffs' own labor where the defendant was not able to furnish it within 48 hours after the time it was requested, which we have held defendant was not obligated to do.

It is undoubtedly the rule, of course, as plaintiffs say, that uncertainty as to the amount of the damage does not preclude recovery where the fact of damage is clearly established. Story Parchment Co. v. Paterson Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544; Palmer v. Connecticut Ry. Co., 311 U.S. 544, 560, 61 S.Ct. 379, 85 L.Ed. 336; Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574; F. Mansfield & Sons Company v. United States, 94 Ct.Cl. 397, 420; Penker Construction Co. v. United States, 96 Ct.Cl. 1, 56. However, it is equally well settled that we cannot indulge in pure speculation. There must be some foundation for the judgment rendered. All of the cases holding that the amount of the damage need not be capable of mathematical computation, nevertheless recognize that there must be some reasonable basis for ascertaining the amount of the damage. In Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L. Ed. 684, the court said: "It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."

This was quoted with approval in Palmer v. Connecticut Ry. Co. supra [311 U.S. 544, 61 S.Ct. 385]. In the latter case it was also said:

"Certainty as to the amount goes no further than to require a basis for a reasoned conclusion."

And in Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 579, it was said: "In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork."

The testimony gives us no clew at all as to the amount of the damage plaintiffs may have suffered as a result of the acts for which we have found the defendant should respond in damages. We cannot hazard even an intelligent guess. We are compelled, therefore, to deny recovery on this claim, for the want of proof.

It results that under the proof plaintiffs are not entitled to recover. Their petition will be dismissed. It is so ordered.

MADDEN, JONES, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.