**L & A JACKSON ENTERPRISES,**
**Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 93–596C.**

United States Court of Federal Claims.

May 30, 1997.

Andrew D. Jackson, Sr., Tempe, AZ, pro se.

Alfred S. Irving, Jr., Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were David M. Cohen, Director, and the Assistant Attorney General, attorneys of record for defendant.

## OPINION

HORN, Judge.

The above-captioned case is before the court for decision subsequent to trial proceedings held in Phoenix, Arizona. The *pro se* litigant, Mr. Andrew D. Jackson, Sr., represented the plaintiff, L & A Jackson Enterprises, which also does business as Southern Air and Electric, is a sole proprietorship.

The claim alleges eleven counts of contract default by the defendant, the United States, acting through the Department of the Navy, Western Division, Naval Facilities Engineering Command, San Bruno, California, for work performed at the Naval Marine Corps Reserve Center in Phoenix, Arizona. The above-captioned case was reopened after a prior dismissal for failure to prosecute. The parties did not seek summary disposition of this case. After attempted settlement negotiations failed, this court ordered the parties to appear for trial.

## PROCEDURAL HISTORY

The *pro se* litigant, Andrew Jackson, Sr., filed a complaint in this court on behalf of L & A Jackson Enterprises, pursuant to Contract No. N62474-89-C-6827, entered into with the United States Department of the Navy. In response, the defendant initially filed a motion to dismiss, pursuant to Rules 41(b) and 81(d)(8) of the Rules of the United States Court of Federal Claims (RCFC). RCFC 81(d)(8) requires a corporate entity to be represented by counsel. Defendant's motion to dismiss argued that the complaint, as filed, although captioned "L & A Jackson Enterprises," doing business as Southern Air & Electrical, was signed by Andrew D. Jackson, Sr., a partner in L & A Jackson Enterprises, who is not a licensed attorney. Therefore, defendant argued that no attorney had entered an appearance on behalf of the corporate plaintiff, in violation of RCFC 81(d)(8), and, therefore, this case should be dismissed. Plaintiff filed a response to the defendant's motion to dismiss, but provided inadequate information to allow this court to make a determination as to the status of plaintiff's complaint and whether defendant's motion to dismiss should be granted.

In light of Mr. Jackson's *pro se* status, this court, on numerous occasions, gave Mr. Jackson opportunities to appear by telephone from his home or office, in order to provide to the court the requisite information regarding the legal status of L & A Jackson Enterprises. Mr. Jackson repeatedly failed to comply with court orders and failed to appear. After hearing nothing from the plaintiff for several months, this court issued an order dismissing the action for failure to prosecute. The court stated as follows:

> Plaintiff has failed to provide the court with information regarding the legal status of L & A Jackson Enterprises, as required in the April 13, 1994 order of this court. Plaintiff failed to appear for the scheduled hearing on May 3, 1994, as required in the April 13, 1994 order of this court, and has failed to provide any explanation for his unexcused absence. Since December 13, 1993, the court has received no filings or contact from the plaintiff, including no notice of change of address or appearance of counsel. Moreover, from the caption of the complaint, it appears that L & A Jackson Enterprises should be represented by counsel, and not by Mr. Jackson, *pro se*, pursuant to the requirements of RCFC 81(d)(8).

In accordance with that decision, the Clerk of the United States Court of Federal Claims dismissed plaintiff's complaint, with prejudice. Subsequently, this court received a motion for reconsideration, pursuant to RCFC 59(a)(1), filed by Andrew Jackson on behalf of the plaintiff, L & A Jackson Enterprises, Inc. In its motion for reconsideration, plaintiff asserted that the Clerk's Office of this court had committed several errors by failing to provide plaintiff with court documents. Moreover, plaintiff contended that L & A Jackson Enterprises is not a corporation. Although no evidence has ever been submitted to this court which would confirm any of the errors by the Clerk's Office alleged by Mr. Jackson, the Clerk sent a letter to Mr. Jackson, informing him of what had recently transpired in his case, requesting that he respond to this court's earlier orders, and educating Mr. Jackson on the appropriate manner for filing a motion for reconsideration. Thereafter, plaintiff filed a response to the issues set out in this court's earlier orders, including notification to this court that L & A Jackson Enterprises is a family business, not a corporation.

The Clerk of the Court wrote to the *pro se* plaintiff again to notify Mr. Jackson that plaintiff still had not complied with the instructions of this court, and still had not provided adequate documentation regarding

the legal status of L & A Jackson Enterprises. Again, all filings were returned for correction by the Clerk of the Court.

Mr. Jackson then resubmitted plaintiff's filings with an enclosed letter to the Clerk of the Court. The Clerk once again responded, informing Mr. Jackson that he still had not complied with the directives of this court, and that, once again, his filings would be returned. In sum, the Clerk stated as follows:

> The court will require that you submit some physical documentation that confirms the status of L & A Enterprises, such as a tax return, documents prepared for use in transactions with the Small Business Administration, business licensing agreements, partnership agreements, articles of incorporation, or other documents necessary to operate a business in Tempe, Arizona or San Francisco, California, which might establish the legal classification of your business. I would stress to you that this issue must be resolved before the court can take any action on a motion for reconsideration.[1]

Finally, this court received information from Mr. Jackson, marginally documenting that L & A Jackson Enterprises is a partnership. Plaintiff's motion for reconsideration, therefore, was filed by the court, and defendant proceeded to file a response. Defendant stated in its response that "it appears that plaintiff is within its rights not to be represented by an attorney licensed to practice in this Court." Defendant further stated that with respect to this court's order dismissing the case for failure to prosecute, "the Government leaves it to the Court's discretion to determine whether to grant plaintiff's motion."

Subsequently, this court issued an order which reopened the case. After a lengthy and difficult period of discovery, during which both parties repeatedly failed to adhere to this court's orders and discovery rules, the court scheduled the trial of this matter. The *pro se* litigant, Mr. Andrew Jackson, Sr., although calling no witnesses, argued the case on behalf of himself and L & A Jackson Enterprises. Mr. Jackson attempted to demonstrate that the delay in performance of the contract at issue was caused solely by the government. Moreover, Mr. Jackson argued that liquidated damages in this case were improperly withheld by the government, in violation of the contract and applicable regulations. Since Mr. Jackson appeared *pro se* and was both the plaintiff and the individual who performed the work, the court allowed him substantial latitude as to the form of his presentation at trial. Having determined that Mr. Jackson's claim should be adjudicated, the court determined it was best to allow Mr. Jackson the opportunity to present his case the only way he was prepared to proceed.

At trial, the defendant, the Department of the Navy, presented two witnesses, the Contracting Officer, Ms. Lidia Chagonjian, and the Deputy Resident Officer in Charge of Construction, Lieutenant James R. Adler, Civil Engineer Corps, United States Navy, in its defense of plaintiff's allegations. The defendant also offered numerous documents in support of its case.

Because of the unusual procedural history, discussed above, this court has found the above-captioned case to be extremely painstaking and lengthy, requiring an unusual amount of micro-management on the part of the court to bring the parties together for even the most elementary conversations during all phases of the case. The unnecessary duration of discovery and trial proceedings in this case is largely the result of the *pro se* status and emotional involvement of the plaintiff, who, although always a gracious gentleman towards the court, was unfamiliar with court proceedings and also unwilling to adapt, especially during pretrial proceedings. Government counsel also made the situation difficult by being unprepared, perhaps because he knew Mr. Jackson might not comply with court orders and court rules, and by frequent displays of unproductive frustration

---

1. During the course of pretrial proceedings, the court and the defendant experienced significant difficulty in reaching the plaintiff, both by mail and by phone. There was also confusion regarding where his business and residence were located, with references in his filings to both Arizona and California.

to match those of the plaintiff. Much time and money, for both the parties and the court, was wasted because the parties failed to cooperate with each other and to properly conduct discovery. Had it not been for litigation support from the Department of the Navy personnel, especially from non-lawyers during pretrial proceedings and at trial, the government would have had far more difficulty trying to present a coherent case. In fact, during the trial, it was Naval personnel who were more familiar with the exhibits than the government trial counsel. Despite the fact that this dispute should have been resolved between the parties, without court intervention, and possibly even prior to its filing in the federal court system, the court ultimately was left with no choice but to schedule and hold the trial. Moreover, the frustration of both parties by the time of trial resulted in a poor record, as well as the discovery by both parties of new, relevant documents during the course of the trial proceedings.

This case, if it proves nothing else, demonstrates that there is an opportunity within the federal court system for a *pro se* plaintiff to have his day in court. At trial, this plaintiff was given an opportunity to present his case in his own unique way and to cross-examine defendant's witness. As a result of the trial proceedings, a record of written exhibits and a transcript of oral testimony is finally before the court. After hearing and rereading the testimony of the witnesses presented at trial several times, reviewing the documentary evidence admitted into the record, and reviewing the relevant law, this court finds that plaintiff has not met his burden of proof in the above-captioned case to prevail on any of the allegations presented in the complaint. Accordingly, and as is discussed more fully below, this court finds in favor of the defendant. The complaint is dismissed.

## FACTS

The plaintiff, L & A Jackson Enterprises, doing business as Southern Air and Electric, responded to Solicitation No. N6247–89–B–6827, issued by the Department of the Navy on October 19, 1989. The Solicitation, Contract, and Award documents were issued to provide and secure an air conditioning system for the security group rooms at the Naval Marine Corps Reserve Center in Phoenix, Arizona. The contract to complete an air conditioning system which was ready for use included furnishing of all labor, materials, and equipment. In sum, the contract involved the installation of four air conditioning units, distribution ducting, controls, electrical power for the units, and incidental related work. On December 1, 1989, plaintiff, L & A Jackson Enterprises, submitted its bid for the project. Subsequently, on February 9, 1990, the contract at issue in this case, Contract No. N62474–89–C–6827, was awarded to the plaintiff in the amount of $24,900.00.

The Solicitation, Offer, and Award documents issued in this case provided several requirements and instructions to prospective bidders, which were also to apply to the recipient of the contract award. Prospective bidders were instructed as follows:

3. CONDITIONS AFFECTING THE WORK: Bidders should visit the site and take such other steps as may be reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Failure to do so will not relieve bidders from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government will assume no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of the contract, unless included in the invitation for bids, the specifications, or related documents.

The solicitation documents also specifically instructed bidders that any requests for explanations or interpretations of any provision or requirement of the contract must be made in writing, and bidders were instructed to acknowledge in writing any amendments to the contract. Prior to the opening of bids on this project, amendments to the solicitation were issued.

Thereafter, on February 9, 1990, after acceptance of bids from prospective contrac-

tors, the Department of the Navy issued its acceptance of plaintiff's bid, signed by Lidia M. Chagonjian, Contracting Officer. That acceptance letter stated as follows:

The Government hereby accepts your offer of 1 December 1988 in the sum of $24,-900.00 for FY 1990 Special Projects C13-88, Add Air Conditioning to Security Group Room, Naval Marine Corps Reserve Center, Phoenix, Arizona in accordance with Base Bid Item 0001—$24,900.00 of Invitation for Bids N62474–89–B–6827 with Amendment No. 0001. The contract completion date will be 10 April 1990.

If applicable and subject to approval of your Contractor Quality Control Plan by the Resident Officer in Charge of Construction, you are hereby directed to proceed with the work under the authority fo [sic] this notice pending execution of such formal contract. The contract time for purposes of establishing the completion date, default, and liquidated damages shall begin to run 15 days from the mailing of this Notice of Award. However, no payment shall be made under this contract until the formal contract is executed.

On February 28, 1990, Contract Modification P00001 was issued, which instructed plaintiff that effective 26 February 1990, the administration of the contract was transferred from the Contracting Office in San Bruno, California, to the Contracting Office in Yuma, Arizona. Both the Notice of Award letter and Modification P00001 instructed plaintiff to contact the Resident Officer in Charge of Construction ("ROICC") in Yuma, regarding the administration of the contract. The ROICC was designated as the authorized representative of the contracting officer, and assigned the primary function to ensure that all contract requirements were met and to supervise the day to day work of the contractor. At trial, the contracting officer, Lidia Chagonjian, described the duties of the ROICC, as follows:

Q. [MR. IRVING] Could you very briefly tell us what the responsibilities of the resident officer in charge of construction are concerning a contract?

A. [MS. CHAGONJIAN] The resident officer in charge of construction is responsible to fulfill all of the requirements, both submittals, Q/A, quality control and quality assurance and every other function of that contract. The only thing that we don't download to them is [sic] they do not have the authority to terminate a contract. Only the procurement contracting officer can do that.

Amendment P00001 also upgraded the required steel from simple hardened steel to ASTM A 627 homogeneous tool-resisting steel, and postponed the bid opening date to December 1, 1989. Plaintiff acknowledged the amendment and submitted a timely bid in accordance with the solicitation for offers. The record reveals no other written requests by the plaintiff for explanations of the work involved, inquiries regarding the requirements of the contract, or interpretations of the contract provisions, prior to the submission of its bid.

The contract specified a schedule for the commencement and completion of work, a liquidated damages clause, and certain penalties for failure to comply with the schedule. The ROICC retained $750.00 for liquidated damages pursuant to the following contract provisions:

4.1 Commencement, Prosecution, and Completion of Work (APR 84): The Contractor shall be required to (a) commence work under this contract within 15 calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than 45 calendar days after the required commencement of work. The time stated for completion shall include final cleanup of the premises (FAR 52.212–3).

4.1.1 Definitions:

a. The date the Contractor receives the notice to proceed is the date of the Notice of Award of the contract.

b. The period within which the Contractor is required to proceed allows for the mailing of the Notice of Award and the Contractor's submission of the required bonds and Certificate of Insurance.

c. The commencement of work is the last day of the period within which the Contractor is required to proceed.

4.2 Liquidated Damages—Construction (APR 84): (FAR 52.21 2–5(a)).

4.2.1 Failure to Complete Work: If the Contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the Government as liquidated damages, the sum of $50.00 for each day of delay (FAR 52.212–5(a)).

     \*     \*     \*     \*     \*     \*

4.2.3 Contractor Liability Without Government Termination: If the Government does not terminate the Contractor's right to proceed, the resulting damage will consist of liquidated damages until the work is completed and accepted (FAR 52.212–5(c)).

The contract also provided that "[b]efore commencing work under this contract, the Contractor shall certify to the Contracting Officer in writing that the required insurance has been obtained." Moreover, pursuant to the contract, plaintiff was required, within 5 days of receipt of the notice of award, to prepare and deliver to the ROICC a schedule of prices. The contractor was also required, within 15 days of receipt of the notice of award, to prepare a "feasible construction schedule." Finally, within 21 days of receipt of the notice of award, plaintiff was required to prepare an equipment delivery schedule. That schedule was to provide a description of the equipment, date of the purchase order, the promised shipping date, the name of the manufacturer or supplier, the date delivery was expected, and the date material or equipment was required, in light of the current progress schedule or network. Furthermore, the provision provided that "[n]o roof penetrations may be made until air conditioning units are on the site."

The contract also required the contractor to maintain "As–Built Drawings" at the jobsite, and specified the following:

16.1 As–Built Drawings: Maintain at the jobsite two sets of full-size contract drawings marked to show any deviations which have been made from the contract drawings, including buried or concealed construction and utility features revealed during the course of construction. Record the horizontal and vertical location of all buried utilities that differ from the contract drawings. These drawings shall be available for review by the Contracting Officer at all times. Upon completion of the work, deliver the marked sets of prints to the Contracting Officer. Requests for partial payments will not be approved if the marked prints are not current, and request for final payment will not be approved until the marked prints are delivered to the Contracting Officer.

On March 29, 1990, a pre-construction conference was held between the parties. There were multiple topics discussed at the pre-construction meeting, including, but not limited to the following: general description of the work; contract completion date; amount of the award; liquidated damages; contract administrator; site visits; scheduling; responsibility of contractor, including contact phone numbers; construction quality; correspondence and office procedures; progress schedules; invoicing procedures; submittals; contract clarifications; materials; testing; inspection; modifications; contract closeout; and required insurance and bonds. The purpose of the meeting was to respond to any contractor concerns or questions regarding the contract requirements and specifications. At the trial of this matter, the following colloquy occurred regarding the pre-construction meeting:

Q [MR. IRVING] Mr. Jackson, you testified earlier that you had certain problems with the contract requirements, is that true, at the very beginning of the contract?

A [MR. JACKSON] That I had trouble—I don't think I said I had trouble with the contract.

Q You had problems with the requirements of the contract?

A No, we had different opinions of the interpretation of the specifications of the contract.

Q Okay. Did the Navy at some point meet with you to discuss the problems that you had with the contract and—

A The interpretation? Yes, they did.

Q   When was that meeting, do you recall?

A   If I remember correctly, it was in December of 1990.

Q   Maybe a little earlier in 1990?

A   No, the specifications. The specifications was in December of 1990. We had different interpretations of the contract from day one. Now, there was also an administrative part of the contract we had different interpretations of.

Q   Let's go over the administrative portion of the contract and the meeting that the Navy had with you. If you would turn to Government Exhibit 209, do you recall that meeting referred to in these minutes?

A   Well, I wouldn't go so far as to call these minutes, but I remember a meeting that we had, preconstruction meeting. The date slips my mind now, but I think it was March, I think it was March or April of 1990.

Q   The minutes state that the meeting took place March 29, 1990.

A   That sounds about right.

  *      *      *      *      *      *

Q   Do you recall who was in attendance at this meeting?

A   My wife, Ruthie Jackson, myself, Lt. Knapowski—

Q   Knapowski.

A   Lt. Harris. Other folks—I don't remember who all was there. I do have it in my minutes who was there.

Q   Do you recall the purpose of that meeting?

A   The purpose? Yes, preconstruction.

Q   In your mind, what does preconstruction mean?

A   Go over the contract.

Q   The entire contract?

A   The specifications of the contract.

Despite the discussions held between the parties at the March 29, 1990 preconstruction meeting, and despite this opportunity for plaintiff to clarify any problems he had with the contract specifications, plaintiff failed to timely commence performance of the contract. In fact, the day after the pre-construction meeting, March 30, 1990, plaintiff requested an extension of time. Plaintiff's letter states, in its entirety: "Per to our award meeting held on 3/29/90. We (Southern Air & Elec.) are requesting an extension of time because of the government delay." Again, on April 10, 1990, plaintiff wrote to defendant, stating the following:

In response to our conversation concerning project completion date 10 April 1990, Southern Air & Elec. feel it's in error, the government cause a delay by not following standard form 1442 section blk 16 which clearly showed a remittance address, different than block 14 which was fill in by Southern Air & Elec.

After receiving acception letter on about 9 March 1990, We notified Linda Banfield (buyer) & Charles Campbell (SBA) for clarification, they was involve in said solicitation, he had requested being notified of said letter. We also disagree with the said completion date because no time was allowed for mailing (sec. 01011 4.1), also no time for submittals for review (sec. # 01300 5.3.2.).

On 21 March 1990, We had a conversation concerning this and Southern Air & Elec. was under the impression that the 29 March 1990 award meeting started the submittals time for review & this was a lump sum bidding (sec. 00101 12.2)

Upon equipments approval we would like to fulfill our contract obligation but request time to do so, as a small minority business, we can not take a lost on this project because our working profit is already low.

The government responded by letter, dated April 18, 1990, and expressed concerns regarding the timely execution of the project:

This letter is to inform you of the government's concern for the timely and correct execution of the subject contract. As of this date, we have not received any of the required documentation and submittals for the work to proceed. The contract completion date is 9 April 1990 and liquidated damages at $50.00 a day began on that date.

A time extension was requested by letter and received by this office on 2 April 1990; however, the letter did not include how

much time was requested and on what basis. Attempts were made to reach you concerning this discrepancy during the week of April 2, 1990, but we did not receive a response from you until 10 April 1990. This conversation also included numerous questions concerning required documentation and submittals, I trust these were answered to your satisfaction; I know ENS Grail spent some time helping you with this at the pre-construction conference as well.

The government emphasizes the timely execution of the subject contract because of the increasing temperatures as spring progresses into summer. These increasing temperatures can be damaging to the equipment in the security room; therefore, delay effects [sic] the mission readiness for NMCRC.

On May 3, 1990, defendant submitted its first formal notification that "key contractual requirements for submission and government approval have not been met: ..." That notification also informed the plaintiff contractor that all submissions and requirements must be met by May 18, 1990, and that liquidated damages were accruing.

When plaintiff again failed to provide the information requested, the Navy sent a "Cure Notice," dated May 30, 1990. The Cure Notice stated:

You are notified that the Government considers your failure to submit the following contractually required submittal documents, complete and conforming to the contract specification sections, a condition that is endangering performance of the contract:.... Therefore, unless this condition is cured within 10 days after receipt of this notice, the Government may terminate for default under the terms and conditions of contract clause FAR 52.249–10 DEFAULT (APR 1984) of this contract.

Plaintiff responded by letter, dated June 21, 1990, informing the Navy that it would be "providing all key contracting requirements as requested." Although the information requested by the Navy was not submitted within the ten (10) day limitation imposed by the Cure Notice, it appears from the record that plaintiff attempted to provide the information

that the Navy requested, albeit in a piecemeal fashion. On June 26, 1990, plaintiff sent a facsimile to the defendant, with accompanying documentation, stating that he "was unable to complete all necessary documentation until this date," but that "[a]ll required documentation with the exception of the submittal status log and 7 copies of each submittal are contained in this transmission."

On March 6, 1991, the deputy ROICC, S.J. Knapowski, as well as the Contracting Officer, Lidia Chagonjian, held another meeting with the plaintiff to discuss the contract specifications and requirements, including conversion of the contract from a lump-sum payment to a progress payment contract, the instructions concerning preparation of payment schedules, preparation of submittals, and the contractor's alleged increase in costs for equipment and materials. The following colloquy from the trial proceedings summarizes the status of the parties' positions as of the March 6, 1991 meeting:

Q [MR. IRVING] Ms. Chagonjian, did there ever come a time when you were called back to work on this contract?

A [MS. CHAGONJIAN] Yes, sir.

Q And when was that?

A It was in March of I believe '91.

Q March of nineteen ninety—?

A One.

Q One. And what was the purpose?

A It seems that we were having some problems with the contractor and headquarters felt, they had called me and asked me to see what we could do to expedite. And maybe there was a way that we could handle the situation.

Q So why did they come back to you? You were in a different division and a different job title.

A No, I was not in a different division in March of '91. We didn't change footprint until, I don't think we changed footprint until the end of '91, beginning of '92. I'm not exactly—When headquarters calls you listen.

Q And when they called what did you do?

A When they called I got in touch with Ensign Grail at the time, asked her to see if we could set up a meeting with the contractor and the Small Business Administration.

Q And Ensign Grail was who?

A He was the, she was in the resident officer in charge of construction's office at the time. She was an engineer. I don't know exactly what title.

Q And why did you get in touch with the Small Business Administration?

A Because Ensign Grail told me that Mr. Jackson was saying that because he was SBA that he did not have to comply with some of the terms of the contract. So I felt it would be a good idea to have a—

MR. JACKSON: I'll object, Your Honor.

THE COURT: What's the basis of the objection.

MR. JACKSON: That's hearsay. Does she have any documents to back that up?

THE COURT: No, she's describing her own conversation. Overruled.

Go ahead.

THE WITNESS: So I asked her to please see if she could make arrangements so we could have the Small Business Administration, a representative from them there.

BY MR. IRVING:

Q And did you have a meeting after that?

A We had a meeting in Phoenix at the Marine Reserve Center with the contractor. Small Business Administration did not send a representative. It was S.K. Golden was there Mr. and Mrs. Jackson were there. And Lt. Knapowski, K–N–O–W–S–C–K–I, I believe.

Q And what took place at this meeting?

A Well, we went over the contract with Mr. and Mrs. Jackson. And at the beginning of the meeting there was quite a few problems because Mr. Jackson wanted to tape the conversation. The ROICC did not want him to tape it nor did I feel that it should be taped. And to be real honest with you I just, I don't even remember if they did tape it or not. But I do remember what happened at the meeting.

Mr. Jackson said that that was an illegal contract because we had submittals. And most of the contracts that he's had he doesn't have to have submittals. I explained to Mr. Jackson that at the time we had put out that contract we felt that it should have been over 25,000. And had it been over 25,000 we would then need bid bonds and performance and payment bonds because those are the regulations.

Q But did you ever come to an understanding concerning the contract requirements for submittals?

A Yes, sir. Mr. Jackson was very upset because he said he hadn't gotten paid. I asked the ROICC why haven't you paid him. And the understanding was because Mr. Jackson had asked for a lump sum payment.

So we had asked Mr. Jackson if he wanted progress payments. If in fact he wanted progress payments then he had to fill out a schedule of prices so we'd have something to bounce it against when we approved payments.

Q And?

A When I left the Lt. Knapowski and I showed him how he does his schedule of prices so he could put it into the residence officer in charge of construction's office and they could start doing progress payments.

Q Okay. What else was discussed at that meeting?

A Submittals. We also discussed, Mr. Jackson came in and said that there was a tremendous increase in costs. And we discussed the submittals. We discussed costs. And we discussed time. So we went over the submittals. And my understanding is that he had two more submittals to submit. And Lt. Knapowski said that he would help him complete his submittals so we could get this thing moving.

Q And with respect to the cost issue what was that discussion about?

A Mr. Jackson told me that he hadn't bought $11,500 worth of equipment. And he wanted a 25 percent across-the-board

increase on his contract. And I said that we could not do that because the escalation had not gone up 25 percent.

Q   Which escalation?

A   The wage indices.

Q   Are these formal wage indices, federal government wage indices, do you recall?

A   DCAS, excuse me, Defense Audit Logistics Agency puts out indices that gives you the rate of inflation per year. And that is always published.

So what we had done was we—and the indices showed about 4 1/2, 3 1/2 to 4 percent. So we offered him 10 percent on the materials that he had not bought increase. And we also told him that we would extend the contract 450 days.

Q   And the 10 percent increase was in the amount of do you recall?

A   One thousand—We had—He had said that he had not bought $11,500 worth of equip, worth of material he still hadn't paid for so we increased that 11,500 which is $1,150 1 believe.

Q   And you did that without seeing any support for his claim that?

A   Yes, I did. But I did ask, I did tell Mr. Jackson that if he could give me the bid sheets, how he had made his bid, or if he could give me any supporting documentation that we would be more than happy to consider it.

Q   Now, when you asked for supporting documentation I'd like to direct your attention to Plaintiff's Exhibit Numbers 3 and 4.

A   Yes.

Q   Are these examples of what you may have wanted to see in support for the claim of cost increase?

A   Yes sir, they are.

Q   But you were not shown these documents at the time you requested?

A   No, sir.

Q   And were you ever shown these documents?

A   Yesterday.

THE COURT: I'm sorry, which documents are those that you saw yesterday?

MR. IRVING: Plaintiff's Exhibits 3 and 4, The Trane Company quotation sheets.

BY MR. IRVING:

Q   So, did you come to any resolution concerning the cost and the time extension?

A   When I left Phoenix it was with the understanding that the ROICC office would issue a modification for a total amount of 450 days and $1,150 escalation. I then got call before I left and—or there's a letter someplace that says that Mr. Jackson did not consider that was the agreement we made. They also called me, and we had not made that type of agreement. And that I had agreed on 20 percent or whatever.

I then talked to Ensign Grail and I told her to go ahead, do some justification, issue a unilateral modification so that he would have some money coming in and we'd give him the time extension, and send it up to our office for signature.

Q   And why did you do this without support from Mr. Jackson?

A   Why did we give him the money without support?

Q   Right.

A   Well, he was already in the, he was already into liquidated damages. We sat down. We had—I've always worked with small disadvantaged business. And we try to be as fair with them and it is our responsibility to walk them through some of these contracts. And we felt that after we had an understanding after the March the 6th meeting that we could get this job done because the Reserve Center was very upset with me and so was the Navy because it was very hot in those rooms and it was a pretty hot summer.

Q   And so to your understanding a modification was issued unilaterally?

A   Yes.

Q   Increasing the time for performance as well as the price increase?

A   Yes.

Q   And who, who calculated the days for the time extension?

A   We calculated the days for the time extension from the beginning of the con-

tract because there was a time when Ensign Grail was not available. So there was a 3-week period that it was in fact a government delay.

Then the other time period we thought it's because Mr. Jackson had not been used to doing submittals. And we decided that in order to see if we could get a good working relationship we asked Mr. Jackson how long he needed to, he had to order the air conditioning units and some steel and some economizers. And we asked him how long do you think, how much lead time are you going to need to order it?

At this time he also asked for advance payment. And we told him that there was no provision in his contract to ask for advance payment. So he could pay the suppliers and get it faster.

Q To your recollection was that the end of the meeting, had you covered all the issues raised?

A Well, we had covered the issues of submittals. WE had covered the issue of the illegality of having submittals in the contract. We covered the issue of time and we covered the issue of money.

Q Did you ever participate in this contract administration or did you have any dealings with this contract after this meeting?

A No, sir.

MR. IRVING: Okay, that's all I have for Ms. Chagonjian, Your Honor.

Ultimately, the contract was further modified on three separate occasions. Modification P00002, effective April 22, 1991, increased the contract price from $24,900.00 to $26,050.00, to cover an increase in cost of equipment and materials. Modification P00002 also extended the contract completion date from April 9, 1990 to June 30, 1991, an increase of four hundred and fifty (450) days. Modification P00003, which superseded P00002, acknowledged the price increase noted in P00002, and extended the contract completion date from June 30, 1991 to October 11, 1991, a total increase of five hundred and forty-nine (549) days. Modification P00004, effective October 11, 1991, also acknowledged the price increase of P00002, and extended

the contract completion date from October 11, 1991, to November 7, 1991.

During the period of time that the above-described modifications were negotiated and issued, plaintiff consistently maintained that performance delays were caused by the government. During this time frame, the parties exchanged several pieces of correspondence which indicate an inherent misunderstanding of the contract requirements on the part of the plaintiff. For example, in a letter dated August 27, 1991, the contractor claimed that performance delays were caused by the government, because plaintiff had not received approval from the Navy for security bars and circuit breakers, which allegedly caused a suspension of work. An examination of the contract, however, does not support plaintiff's allegations. During the trial proceedings, Lt. Adler, Deputy ROICC, commented on this issue:

Q [MR. IRVING] Okay. And when did you hear from Mr. Jackson, does this trigger your recollection at all of when you heard from Mr. Jackson that he needed additional time for the ordering of the securities bars?

A [LT. ADLER] It would have to be probably early October.

Q And you approved the or you indicated to Mr. Jackson no approval was necessary for the security bars back in August of 1991?

A Yes. Probably more like September. His letter was sent in August.

Q Okay.

A He—There was no approval needed for security bars. But since he was changing what was required by the contract he needed to ask approval to do that change. And he was asking to submit a different type of steel for the security bars.

Q And did you permit that?

A Yes, I did, again in the interest of being fair and reasonable and getting the contract done. I think Lidia talked about the Reserve Center complaining about the having to go through two summers or something with no air conditioning. I was getting those same complaints. I came in in the middle of the summer and they were

really complaining pretty loudly at that time because now this had been another summer that they had gone through with secure—or without the air conditioning.

So at that point it was pretty important. Along with that and the also the issue that happened with the contract. I was pushing to get the contract completed. And in the interest of keeping the contract going I went ahead and approved the deviation on the security bars.

In fact, by letter dated September 30, 1991, the deputy ROICC, Lt. Adler, responded to plaintiff's proposed change to the security bars. Plaintiff's change would have required anchorage to the roof of the building, which deviated from the method set forth in the attachment shown on drawing sheet M–2. Lt. Adler directed plaintiff to install the security bars as shown on the drawing sheet M–2, and to provide the modification hardware for the new circuit breaker, as required by detail 2 on drawing M–2. Lt. Adler stated the following in his letter: "this does not constitute a changed condition as the existing conditions are clearly shown in the contract drawings, you had ample opportunity to verify existing conditions prior to submitting your bid, and since the contract clearly tells you to provided [sic] the modification hardware."

In another letter, dated October 3, 1991, plaintiff indicated that there would be additional delays in performance and that there would be additional increases in costs. Specifically, the contractor noted that performance was delayed because he did not receive a response to a March 13, 1991 inquiry until October 2, 1991, that the original ductwork was missing from the worksite, and that several pieces of the ductwork needed to be replaced. Plaintiff also noted that some of the duct insulation had to be replaced because of exposure to the elements.

Lt. Adler, by letter dated October 8, 1991, responded to plaintiff's concerns. Lt. Adler reiterated his direction to plaintiff concerning the installation of the security bars pursuant to detail 2 of drawing M–2. Lt. Adler also stated that the security bars were not required to be fastened to the roof deck and, therefore, the composition of the roof posed no impediment to the installation as shown in the drawing detail. Lt. Adler further explained that the security bar assembly as shown was designed to set into a sleeve flange, which sits inside the roof penetration, with overlaps being sealed by weatherproof caulking. Plaintiff responded, on October 15, 1991, by requesting a twenty-three (23) day time extension, stating that it would take seven (7) to ten (10) working days for delivery of the steel that he had ordered on October 15, 1991, and another twelve (12) working days for installation.

On October 21, 1991, Lt. Adler, by letter, again expressed his concern over plaintiff's lack of diligence, considering that the government had extended the contract performance period by a total of five hundred and forty-nine (549) days. Nonetheless, Lt. Adler assured Mr. Jackson that his request would be considered. Lt. Adler subsequently agreed to extend the contract completion date from October 11, 1991 to November 7, 1991, as requested by plaintiff. On November 15, 1991, however, plaintiff requested another time extension, this time for ten (10) days, "due to the delivery delay of the Security Bar Materials. . . ." On November 27, 1991, the government denied plaintiff's request for a time extension for the delay in delivery of security bars. Lt. Adler, however, informed the plaintiff that his request for a further time extension would be considered if the plaintiff could, among other things, produce the purchase order or other correspondence to show the timeliness of the ordering and any assurances from the supplier of the acceptance of the order and the scheduled delivery.

On November 29, 1991, plaintiff, again, requested an extension of time, claiming that his order for steel could not be filled by the manufacturer due to the small quantity. The letter further indicated that the steel bars were not ordered until October 16, 1991. Plaintiff did not provide an explanation for the delay in ordering the steel bars. Because all remaining work on the contract depended upon the installation of the security bars, Lt. Adler, in an effort to expedite completion of the project, allowed plaintiff to

provide a lesser grade of steel bars, which was more readily available.

Despite what amounted to an extension in performance for over five hundred and forty-nine (549) days, despite several cure notices and multiple negotiations, plaintiff still failed to complete the project in a timely fashion. The project was accepted by the government on November 22, 1991, fifteen (15) days after the November 7, 1991 final, revised, completion date. Although problems still remained to be resolved between the parties, *i.e.*, punchlist work, testing, and balancing of the system, Lt. Adler testified that the government had, in fact, accepted the project:

> Q [MR. IRVING] Okay. And the contract was completed or the Navy accepted the contract on November 22, 1991?
>
> A [LT. ADLER] Yes.

On December 5, 1991, after acceptance of the project by the Navy, the ROICC sent a letter to L & A Jackson Enterprises, indicating that the Navy was retaining $750.00 in liquidated damages, pursuant to the contract, based upon plaintiff's failure to complete performance of the project in a timely fashion.

On December 23, 1991, plaintiff sent a letter to defendant, maintaining his opposition to the withholding of liquidated damages, as well as disputing the relevancy of certain contract requirements to plaintiff's performance of the work. The deputy ROICC, Lt. Adler, responded to plaintiff's concerns by letter dated December 27, 1991, again informing the plaintiff, very specifically, why the defendant maintained that the withholdings by the government were proper and in accordance with both the contract and its governing regulations. That letter stated:

> The following comments are provided in response to your letter of 23 Dec 91. Your Invoice No. 1004 was reduced by $3,750 for the following reasons.
>
> 1. Liquidated damages are being withheld in the amount of $750.00 ($50.00/day at 15 days). Your current contract completion date is 7 Nov 91. The Government accepted beneficial occupancy of the work on 22 Nov 91. Your contract states that liquidated damages will be assessed in the amount of $50.00 per day for each day of delay should you fail to complete the work

> within the time specified in the contract or any extensions (Specification 01011.4.2). You have failed to provide adequate documentation to support further time extensions beyond the many already allowed.
>
> 2. $3,000 is being withheld to protect the Government's interest in accordance with FAR Clause 52.232–5, Payments under Fixed–Price Construction (APR 89). Paragraph (e) of this clause states that when the work is substantially complete, the Contracting Officer may retain that amount the Contracting Officer considers adequate for protection of the Government. Our letter Ser. 2379/4C of 11 May 90 explained our standard retention amounts for missing contractual items. The following amounts are being withheld:
>
> > $1,000 for submission of the As–Built Drawings.
> >
> > $1,000 for testing and balancing and the submittal of the test/balance reports.
> >
> > $1,000 for the remainder of the contract punchlist items, cleanup, outstanding submittals, etc.
>
> In accordance with paragraph (h), the Government will pay the amount due after completion and acceptance of all work and presentation of a properly executed Final Release.

On January 16, 1992, plaintiff submitted a claim for the payment of the amount of liquidated damages withheld by the defendant. The next day, January 17, 1992, the contractor submitted a letter titled *"WITHHOLDING OF FUNDS."* Plaintiff's letter noted his understanding that the as-built drawings requirement did not apply to the contractor, because the requirement only applied to new construction and the instant project was simply a modification to an existing structure. On February 6, 1992, the ROICC responded to the plaintiff by letter, further explaining why the funds were withheld, suggesting that the contractor complete the punchlist items set forth in the January 23, 1992 letter, so that payment could be made. Plaintiff responded by letter, dated February 18, 1992, disputing the ROICC's conclusions regarding the punchlist items which remained to be corrected. Plaintiff further accused the

Navy of discriminating against L & A Jackson Enterprises because it is a minority contractor. Plaintiff alleged that the ROICC office has a "record of using and abusing small contractors by having a unreasonable punchlist...."

Finally, on September 22, 1992, the contracting officer issued a final decision, denying plaintiff's claims and request for payment. The final decision states as follows:

The original contract performance period was only 45 days. The Government was generous to a fault in accommodating and assisting SAE [Southern Air & Electric] in the completion of a simple project. SAE had been granted time extensions totaling 576 calendar days and given direction on numerous occasions but to no avail.

The contract requirements were simply and clearly stated and depicted. SAE cannot allocate to the Government its prebid responsibility of determining the availability of the specified steel bars. SAE was required to ascertain any difficulty in obtaining the specified steel before the submission of its bid and certainly before October 16, 1991. Any issues respecting restrictiveness of the specification should have been raised during bidding rather than the performance period. The Government was not responsible for any delays in the ordering and subsequent delivery of the steel bars. Accordingly, your claim is denied in its entirety. By this decision, SAE's contract is assessed liquidated damages in the amount of $750 and retention of this amount shall not be released. I am not directing a credit against your contract for providing the lesser grade of steel only because the ROICC approved the deviation.

This is the Final Decision of the Contracting Officer. This Decision may be appealed to the Armed Services Board of Contract Appeals, which is the authorized representative of the Secretary for hearing and determining contract disputes....

The plaintiff, L & A Jackson Enterprises, filed its complaint in this court on September 29, 1993, seeking the following: $2,120.35, for an alleged increase in costs in equipment and materials that resulted from an alleged government caused delay; $987.65, for the replacement of ductwork and insulation; $750.00, for unlawful withholding of liquidated damages; interest upon payments made in the amount of $8,790.84, $900.00, and $3,000.00, and Contract Disputes Act interest. Throughout the life of this case, there has always been confusion regarding exactly what plaintiff alleges, and the damages he is claiming. The following colloquy ensued at the trial proceedings regarding a breakdown of plaintiff's claim for relief:

Q [MR. IRVING] In your complaint, Mr. Jackson, you are seeking $2,120.35 for increase in costs of equipment and materials, is that correct?

A [MR. JACKSON] That is correct.

Q You are also seeking $750 of liquidated damages that were assessed, is that correct?

A That is correct.

Q You're seeking $987.65 for ductwork and insulation, repairs and replacement, is that correct?

A That is correct.

Q Now, you also have a little confusion over—

THE COURT: I'm sorry, do you want to repeat that question from the beginning?

MR. IRVING: Strike that, Your Honor.

BY MR. IRVING:

Q In your statement of issues and contentions of fact and law, it appears you're also seeking $8,790.84 for equipment, materials, tools, labor supplied during the term of the contract. Is that correct?

A No, I'm not seeking that amount. That amount has been paid. I'm seeking the interest on that amount for 15 months or 12 months, whatever it was.

Q Okay, thank you. Your complaint shows, Mr. Jackson, that you're also seeking interest on $900 that the Navy withheld from you, from one of your payments?

A That is correct.

Q Now, what your complaint does not show is your prayer for interest on $3,000 that were withheld from you during the January, 1991 and February, 1994 time

period. You are now seeking interest on that amount, correct?

A That is correct. It's in the complaint, if you look at Section 10, the amount was not added, but the concept was.

Q So, excluding interest, what we get is a total of $3,858 that you're seeking in this case, is that correct?

A I don't know about the figure, but it's the $2,100 and the—

Q I'll read it for you.

A Okay.

Q The $750 plus the $2,120.35 plus the $987.65.

A All the above is correct.

Q My calculations, that would get us $3,858.

A Then that's correct.

Upon a review of the record, the testimony/argument of the *pro se* litigant, the testimony of the witnesses presented by the government, and the governing law, this court finds that plaintiff has failed to demonstrate entitlement to the relief requested in the complaint.

## DISCUSSION

As discussed above, the procedural history of this case leading up to the trial is peculiar for what initially appeared to be a standard government contract claim. Despite the unusual history of this case, however, the issues presently before this court are clear. Plaintiff has claimed the following: (1) that he is owed money for an increase in costs in equipment and materials that resulted from alleged government caused delay; (2) that liquidated damages were not properly assessed, and that the liquidated damages clause contained in the subject contract was not fair and reasonable; and, (3) that the government has violated the Prompt Payment Act.

■ Plaintiff in this case has claimed damages in the amount of $2,120.35, for increases in costs for equipment and materials, which allegedly resulted from government caused delay. In order to prevail on such a claim, plaintiff bears the burden of demonstrating that (1) the alleged delay was caused

proximately by the government, *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 969 (1965), (citing *River Constr. Corp. v. United States,* 159 Ct.Cl. 254, 270, 1962 WL 9302 (1962); *Laburnum Constr. Corp. v. United States,* 163 Ct.Cl. 339, 325 F.2d 451 (1963); *J.A. Ross & Co. v. United States,* 126 Ct.Cl. 323, 331–34, 115 F.Supp. 187 (1953)); (2) the delay caused specific and quantifiable damages which harmed the contractor, *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. at 199, 351 F.2d at 969 (citing *River Constr. Corp. v. United States,* 159 Ct.Cl. 254; *Addison Miller, Inc. v. United States,* 108 Ct.Cl. 513, 70 F.Supp. 893, *cert. denied,* 332 U.S. 836, 109 Ct.Cl. 869, 68 S.Ct. 217, 92 L.Ed. 408 (1947); *J.D. Hedin Constr. Co. v. United States,* 171 Ct.Cl. 70, 86–87, 347 F.2d 235, 246–47 (1965)); and (3) the extent and period of the alleged delay was unreasonable and is provable within a reasonable degree of certainty. *Wilner v. United States,* 24 F.3d 1397, 1401 (Fed.Cir.1994); *Avedon Corp. v. United States,* 15 Cl.Ct. 648, 653 (1988); *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. at 197, 351 F.2d at 967 (1965) (citing *River Constr. Corp. v. United States,* 159 Ct.Cl. at 270; *F.H. McGraw & Co. v. United States,* 131 Ct.Cl. 501, 506–07, 130 F.Supp. 394 (1955)); *Beauchamp Const. Co., Inc. v. United States,* 14 Cl.Ct. 430, 437 (1988). Moreover, in proving its case, plaintiff bears the "heavy burden" of demonstrating each element of this three-part test by "substantial evidence." *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 808–09 (Fed.Cir.1984); *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 559 (Fed. Cir.1982).

■ After a review of the testimony and documentary evidence submitted in the above-captioned case, this court concludes that the plaintiff has failed to prove, by substantial evidence, that the alleged delay was proximately caused by the government. Furthermore, it is apparent from the record that throughout the bidding, offer, and performance period of this contract, the Navy exceeded its responsibility to work with and to try to explain contract terms to the contractor in order to ensure compliance with

contract requirements and specifications. The Navy also continuously extended the contract performance period in order to enable the contractor to complete performance. Despite efforts undertaken by the Navy to ensure that the contractor properly performed this contract in a timely fashion, ultimately, it is the contractor's responsibility, at each stage of the procurement and performance process, to review, understand, and properly adhere to each specification and requirement in the Solicitation, Offer, and Contract. Moreover, not only did plaintiff fail to prove that the Navy was responsible for contract performance delays, but the record in this case reveals that the delays in performance of this contract were primarily the fault of the contractor. The court finds that the performance delays that are the subject of this case are the result of the following factors: (1) plaintiff's failure to acknowledge the ROICC as the contract administrator; (2) plaintiff's mistaken belief that the contractor's status as a small minority business exempted the contractor from certain contract requirements; (3) plaintiff's failure to provide the Navy with required submittals in a timely fashion; and (4) plaintiff's failure to schedule and complete performance in a timely fashion. There is also no evidence in the written record, and the court has had an opportunity to observe key Naval personnel involved in this case, that plaintiff's allegations regarding discrimination based on his small and/or minority business status have any merit. In fact, plaintiff produced no evidence on this point.

Throughout the contract performance, plaintiff failed to understand and accept that the ROICC was the contract administrator and his point of contact. Plaintiff appeared to believe that only the contracting officer had authority to administer the contract. Despite plaintiff's apparent lack of understanding, however, the record reveals that the Navy, on several occasions, discussed this problem with the contractor. Moreover, the contract documents clearly identify the ROICC as the contract administrator. On February 28, 1990, contract modification P00001 was issued, which instructed plaintiff that "[e]ffective 26 February 1990, the administration of subject contract is trans-

ferred" from the Contracting Office in San Bruno, California, to the Contracting Office in Yuma, Arizona. Both the Notice of Award letter and Modification P00001 instructed plaintiff to contact the ROICC in Yuma, regarding the administration of the contract. In a letter dated October 21, 1991, Lt. Adler, the Deputy Resident Officer in Charge of Construction, stated the following:

> In regards to the administrative authority for the project, the award document clearly identifies the 'Resident Officer in Charge of Construction, Marine Corps Air Station, Building 731, Yuma, Arizona, 85369-5000' as the administrator for your contract (SF1442 for Contract N62474-89-C-6827, awarded 9 Feb 90 and signed by Lidia Chagonjian, block 26). WESTNAVFACENGCOM awarded this contract but delegated all administrative authority to this office. LT Harris represents the customer only. All correspondence, including official letters, submittals, daily reports and payrolls, should be sent to this office. This has been explained to you before both in WESTNAVFACENGCOM letter Ser. 0213LL:el of 9 Feb 90 and ROICC Yuma letter Ser. 2379/4C of 11 May 90.

Lt. Adler also reminded the plaintiff that information regarding authority of the ROICC to administer the contract had been explained in both the award letter, dated February 9, 1 990, and in a subsequent letter dated May 11, 1990.

Despite this correspondence, plaintiff still refused to acknowledge the ROICC as the administrator of the contract and continued to direct correspondence to the main office of the contracting officer. Even as late as March 26, 1991, plaintiff maintained the view that the ROICC's authority to administer the contract had been dissolved or relinquished. Because plaintiff was not dealing with the correct entity for contract administration issues, performance was further complicated and ultimately delayed. During the trial proceedings, Lt. Adler articulated his frustration with plaintiff's lack of understanding of the ROICC's duties and responsibilities:

> A [LT. ADLER]...In fact there's a letter of designation designating me as the

officer in charge of the office and also as his assistant for the OICC side which is the officer in charge of construction, and then as deputy for the ROICC side which is resident officer in charge of construction.

Q [MR. IRVING] And how were you received by the contractor?

A It was quite difficult at first. The contractor did not recognize me as having the authority.

Q And why not? Do you know?

A He felt they needed something written in writing even though I told him verbally several times. In fact, what happened was when the contract got started up again with the unilateral change order nothing happened for quite a while. The contractor did not start the work and made some attempts to contact him. And basically when I finally contacted him he said that he was waiting for an answer to his August letter. I think it was the exhibit you were just dealing with.

A Do you want to take a look at that August letter. It's Government Exhibit 227.

A Continuing on with that question, basically he sent this letter to WESTDIV. And there was no copy sent to ROICC Yuma. And so basically as the administrative contracting office at Yuma we had no idea this letter was generated, was in the system.

So when I contacted Mr. Jackson I quickly found out, well, maybe not quickly but he mentioned that he was not proceeding and he needed answers to his questions. And I explained to him that I don't know what questions you're talking about. What questions? And he said there is a letter that he sent to WESTDIV. Eventually we had to track it down.

But getting back on the issue, I had to explain to him that, no, you need to send your letters to us. You need to contact us. We are the administrative contracting office. And he was pretty defiant. He said, no, this does not say that. And I basically had to walk him through the contract again

and show him where in the contract it says that Yuma is the administrative contracting office and why I have the authority issue or to deal with the contract.

Instead of seeking assistance from the ROICC, as outlined in the contract documents, and repeatedly identified as the appropriate source for guidance to Mr. Jackson, plaintiff sought assistance from outside sources, such as the Small Business Administration, the local chamber of commerce, and politicians, for guidance on the requirements of the contract and the contractor's responsibilities under the contract. Evidently, plaintiff believed that by gathering information from outside sources on how to deal with the government, he could somehow exempt the contractor from requirements specifically outlined in the contract documents. Mr. Jackson failed to understand, however, that despite any information provided to him by the Small Business Administration, or any other outside source, nothing exempted him from the terms and conditions of the contract. At trial, the following colloquy ensued between the plaintiff, Mr. Jackson, and the contracting officer, Lidia Chagonjian:

Q [MR. JACKSON] So you had no knowledge that we were being assisted by the Maricopa County Chambers of, excuse me, Chambers of Commerce?

A [MS. CHAGONJIAN] You mentioned that you were being assisted by the Chamber of Commerce, by SBA, I don't know who else. And what I told you was that this was a Navy contract put under the regulations and that you would have to abide by the regulations within the contract.

Somehow, the contractor had deduced through his dealings with the Small Business Administration that as a small minority contractor, that he was exempt from certain requirements of the contract, and held steadfast to the notion that the Navy was wrong in requiring him to adhere to the terms of the contract.

During the trial, Mr. Jackson again suggested that the requirements of the contract did not apply to the contractor.[2]

2. The contract at issue, however, is not a small    business set-aside contract. Moreover, even if

MR. JACKSON: Okay. After speaking, after speaking with Ensign Grail our concerns was discussed concerning the contract with a completion date in the award letter that did not reflect any time for equipment approval which the government has the right to approve the equipment that's being installed on their, in their behalf. We both agreed, we set up a time on March 29, 1990, to have a pre-conference—construction conference which was held in Phoenix. Persons present at the—it was held at, pre-conference was held in Phoenix, Arizona, at the Navy Marine Corps Reserve Center. Present at the meeting was Andrew Jackson and Ruthie Jackson representing Southern Air & Electric, Ensign Grail, Lt. Harris, Capt. Dittu—Ditto.

THE COURT: You want to spell that?

MR. JACKSON: D–I–T–T–O.

THE COURT: Go ahead.

MR. JACKSON: And CTA2 Richardson represented the government. Richards. Correction, Richards.

At that meeting we discussed several things, several other areas including but not limited to schedule, pricing, construction schedule, equipment. My interpretation concerning the construction schedule and equipment delivery schedule, the contractor daily reports and various requirements submitted were unrelevant to the contract based upon the amount the contract was awarded which was under $25,000.

THE COURT: I'm not quite sure I follow that last statement. What are you trying to say?

MR. JACKSON: Again, reference the contract is broken down into different amounts. They have one contract go up to $10,000, another contract goes up, this contract, anything under 25, award at $25,000 is considered a small purchase.

THE COURT: So what are you saying? What's the significance of what you're saying?

MR. JACKSON: That was our interpretation of the contract. Their interpretation was that it was in the contract so they wanted it. So they went out, we had to support, we had as—

THE COURT: What's the difference of whether it's under 25,000 if there are conditions in the contract—I guess that's my question, if there are conditions that are included in the contract what's the significance of the fact that it's over or under 25,000? Are you suggesting the terms of the contract don't apply under 25,000?

MR. JACKSON: No. There's a different, there's a different ruling under contracts under 25,000.

The March 1991 meeting with Mr. Jackson, described above by Ms. Chagonjian; evidences plaintiff's misunderstanding of the contract terms and his attempt to change those terms because of his alleged involvement with the Small Business Administration.

As discussed above, and as is evident from the testimony at the trial, Mr. Jackson's misunderstandings about the contract administration and performance requirements were not the result of any actions or inactions by the government. It was Mr. Jackson's misunderstanding, failure to communicate, and failure to take directions, which caused the performance delays. Moreover, plaintiff's failure to provide the Navy with contract submittals, and plaintiff's improper submittals and incomplete performance, accounted for the performance delays. They were not the result of government wrongdoing or negligence.

Plaintiff claims that submittals were supplied to the government on April 13, 1990. These submittals, however, were rejected by the Navy on May 2, 1990, noting that they were "incomplete" and "disapproved." Plaintiff further claims that the submittals were resubmitted on June 26, 1990. These subsequent submittals also were found to be incomplete, and the contractor was required to provide additional submittals on August 21, 1990. In addition, on September 12, 1990,

this contract were a small business set-aside contract, the terms and conditions of the contract would still be controlling.

the contractor was required to resubmit submittals for the air conditioning units, because the original submittals were for down discharge air conditioning units, rather than for horizontal discharge units, required by the contract.

In addition to the submittals discussed above, the contract required several other submissions, which plaintiff also failed to supply in a timely fashion. The contract required plaintiff to certify to the contracting officer that the required insurance had been obtained as required by paragraph 9.2.2 of section 01010 of the Solicitation documents. The contractor was required to provide a schedule of prices to the ROICC on specified forms. The contractor was required to provide a feasible construction schedule within fifteen (15) days of receipt of the Notice of Award. And, finally, the contractor was required to provide a schedule showing procurement plans for materials and equipment within twenty-one (21) days of receipt of the Notice of Award. The contractor provided none of these items in a timely fashion.

In sum, this court determines that plaintiff has failed to meet its burden of proving that the performance delays which occurred in this case were the result of any wrongdoing, negligence, actions or inactions on the part of the Navy. The court finds that the performance delays raised by plaintiff were, in fact, a result of plaintiff's refusal to acknowledge and deal with the ROICC as the contract administrator; plaintiff's mistaken belief, even after the facts were explained to him, that his status as a small minority business exempted the contractor from certain contract requirements; plaintiff's failure to provide the Navy with submittals, as required by the contract, in a timely fashion; and plaintiff's failure to schedule and complete performance in a timely fashion.

■ As a result of the performance delays, plaintiff was assessed liquidated damages totaling $750.00. After numerous extensions of time to complete the project, the final day for project completion was set as November 7, 1991. Plaintiff did not complete the project, however, until fifteen (15) days thereafter. Therefore, the government assessed liquidated damages, pursuant to the contract, at $50.00 per day for fifteen (15) days. The liquidated damages clause in the contract, section 4.2.1 of section 01011 of the contract, was clear, and understood by both parties. The clause provides as follows:

> If the Contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the Government as liquidated damages, the sum of $50.00 for each day of delay (FAR 52.212-5(a)).

Plaintiff alleges that the assessment of liquidated damages was improper and seeks payment of the $750.00 withheld. Defendant maintains not only that the liquidated damages clause was fair and reasonable, but also that the liquidated damages in this case were properly assessed by the government.

■ The inclusion of liquidated damages clauses in government contracts is valid, and not against public policy. *Jennie-O Foods, Inc. v. United States,* 217 Ct.Cl. 314, 334, 580 F.2d 400, 412 (1978); *Skip Kirchdorfer, Inc. v. United States,* 229 Ct.Cl. 560, 564-66, 1981 WL 22058 (1981); *JMNI, Inc. v. United States,* 4 Cl.Ct. 310, 315 (1984); *Prestex, Inc. v. United States,* 3 Cl.Ct. 373, 382 (1983), *aff'd without op.,* 746 F.2d 1489 (Fed.Cir. 1984). The United States Supreme Court in *Priebe & Sons v. United States,* stated the following:

> Today the law does not look with disfavor upon 'liquidated damages' provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. *Wise v. United States, supra,* [249 U.S. 361] p. 365 [39 S.Ct. 303, p. 304, 63 L.Ed. 647 (1919)]; *Sun Printing & Pub. Assn. v. Moore,* 183 U.S. 642, 672-674 [22 S.Ct. 240, 252-253, 46 L.Ed. 366]; Restatement, Contracts 339; *Dunlop Pneumatic Tyre Co. v. New Garage & M. Co.,* [1915] A.C. 79. And see *Kothe v. [R.C.] Taylor Trust,* 280 U.S. 224, 226 [50 S.Ct. 142, 143, 74 L.Ed. 382 (1930)]. They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. *United States v. Bethlehem Steel Co., supra,* [205

U.S. 105] p. 121 [27 S.Ct. 450, p. 456, 51 L.Ed. 731 (1907)]; *Clydebank Engineering & Shipbuilding Co. v. Castaneda,* [1905] A.C. 6, 11–13, 20; *United States v. Walkof,* 144 F.2d 75, 77. And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract. *United States v. Bethlehem Steel Co., supra,* [at] p. 121 [27 S.Ct. at p. 456].

*Priebe & Sons v. United States,* 332 U.S. 407, 411–12, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947). Further, this court's predecessor, the United States Court of Claims, in *Higgs v. United States,* 212 Ct.Cl. 146, 546 F.2d 373 (1976), set forth a three-part test to ensure that a liquidated damages clause is a viable and mutually agreed upon provision of a contract, not a mere penalty: (1) did the parties intend to provide for liquidated damages or a penalty; (2) would the anticipated damages from any breach be uncertain in amount and difficult to prove; and, (3) does the amount of liquidated damages bear a reasonable relationship to any actual damages that may be sustained by the breach. *Higgs v. United States,* 212 Ct.Cl. at 151–52, 546 F.2d at 377.

It is clear from the record that the parties intended to provide for liquidated damages. The contract provision states that "[i]f the contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the Government as liquidated damages, the sum of $50.00 for each day of delay (FAR 52.212–5(a))." There is no reason, based on the record before the court, to believe that this provision was not understood by the contractor. Moreover, there were, as is discussed above, several opportunities for the contractor to either request additional information, dispute the provision, or ask for clarification on the meaning of the provision. None of these steps were taken by the contractor. In fact, at no time during the bidding, award, or pre-construction period, did this contractor ever claim that the liquidated damages clause was not agreed upon, was unfair, unreasonable, or in contravention of either law or public policy.

Furthermore, the anticipated damages from the performance delays were uncertain, particularly when, as in this case, it would have been impossible for the Navy to quantify the type of damages that would accrue by not having air conditioning in the security group rooms at the Naval Marine Corps Center in Phoenix, Arizona, for two hot summers. Finally, plaintiff has presented no evidence to prove that the liquidated damages clause was anything but fair and reasonable.

Plaintiff's claim that the withholding of liquidated damages was unlawful is, again, based upon his belief that performance delays were the result of either commissions or omissions on the part of the Navy. As discussed above, this court disagrees, and has found that the performance delays were, instead, a result of both commissions and omissions on the part of the contractor. Simply put, plaintiff cannot justify the repeated requests for extensions of time to perform this contract, or his failure even to perform the contract by the end of the final extension period. As discussed above, the Navy acted generously by allowing five hundred and forty-nine (549) extension days, and by attempting over and over again to ensure that the contractor understood the requirements of the contract in order to help him abide by its terms. Despite the government's efforts, however, plaintiff not only continued to request additional time for performance, but also continued to try to place the blame for such requests upon the Navy.

By letter dated October 21, 1991, the ROICC expressed concern over plaintiff's lack of diligence, considering that the defendant had already substantially extended the contract performance dates. Nonetheless, Lt. Adler agreed to a bilateral modification, extending the contract completion date from October 11, 1991, to November 7, 1991, as requested by plaintiff. Plaintiff, however, requested another time extension on November 15, 1991, this time for an additional ten (10) days "due to the delivery delay of the Security Bars Materials." And, on November 29, 1991, plaintiff requested another time extension because his order for steel could not be filled by its manufacturer due to the

small quantity ordered. To expedite completion, Lt. Adler allowed plaintiff to provide a lesser grade of steel bars which was more readily available, but did not allow another extension to the contract. The steel bars were installed as shown in the contract drawings.

As Lt. Adler noted in his September 30, 1991 letter to plaintiff, the contractor should have resolved issues concerning the steel bars at the pre-bid stage of the contract. Paragraph 5 of Section 00101 of the Solicitation required any prospective bidder desiring an explanation or interpretation of the solicitation, drawings, specifications, etc., to make such requests in writing. No such request was made by the plaintiff. Moreover, pursuant to Section 00101, paragraph 3 of the Solicitation, the contractor was required to visit the site and determine the conditions of the job. That provision also provided that the contractor would not be relieved of the "responsibility for estimating properly the difficulty or cost of successfully performing the work." In fact, the contractor did not order the steel bars until October 15, 1991, to meet obligations of which he had been aware since receipt of Solicitation Amendment P00001.

▆ Finally, the plaintiff contractor, at trial, argued that the delay which resulted in the assessment of liquidated damages was also caused by an Act of God in the form of unusually rainy weather.

A [MR. JACKSON] ... By working on the roof, cutting holes in the roof, we could not work on rainy days or could be two to three days later if there's water standing on the roof.

During that time which, if you notice the contract performance time was from October through November, last part of September through the first part of November, is catching us in our rainy season. Our rainy season and we have documents that there was rain, there was several days noted that—where's your paper? I need to know how many rainy days it was. That's why we stated that it was not—decision did not reflect to the condition,

the site condition or the project conditions in his answer.

\* \* \* \* \* \*

THE COURT: What was provided in the contract regarding the interception of the elements that you couldn't work during a rainstorm?

THE WITNESS: That we couldn't work when there was water standing—

THE COURT: I understand you couldn't, but was there any mention made of that possibility in the contract?

THE WITNESS: I'm scratching my head, trying to remember. I know it was told to me several times by the—

THE COURT: Okay, well, we'll pull that out, don't worry about it. Now, you said the rainy season was from when to when?

THE WITNESS: Our rainy season is from August to November, and could go into December.

THE COURT: How come it rained yesterday?

(Laughter.)

THE WITNESS: We have two rainy seasons. We have a late summer, fall and spring is our rainy season.

THE COURT: So, it's August to November, generally, when to when?

THE WITNESS: It can go from August to December and stretch into January, and it can go from March to July.

THE COURT: The year in question when you did the work, was it a particularly long rainy season or was it unusual?

THE WITNESS: Well, to be honest with you, I can't remember if it was unusual, but I know we did have quite a few rainy days within that period. And, it was one of our hottest summers, so if it was one of our hottest summers, the hotter the summer, the longer the rainy season would be at the end, and 1991 was a record set here in Phoenix.

The contract at issue provides for delays that are the result of Acts of God or unusual weather. The contract provides that a contractor cannot be terminated if "[t]he delay in completing the work arises from un-

foreseeable causes beyond the control and without the fault or negligence of the Contractor." The contract also states that the contractor cannot be terminated if "[t]he Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay." Moreover, "[i]t is well settled that where delays are occasioned by factors beyond the control of the contractor or the government, a contractor cannot recover damages from the government for the delays, nor can the government properly assess liquidated damages against the contractor." *J.D. Hedin Constr. Co. v. United States*, 171 Ct.Cl. 70, 98, 100, 347 F.2d 235, 253 (1965).

At the March 29, 1990 pre-construction meeting, the reporting requirements of a weather delay were discussed with the plaintiff. The minutes of the pre-construction meeting state that "[w]eather related time extension requests must relate to official weather data and be beyond normal conditions." In the above-captioned case, plaintiff never submitted a request for an extension of time due to unusual weather conditions. Moreover, plaintiff never provided the government, or the court, with official weather data demonstrating a period of unusual weather during contract performance, as required by the contract. Plaintiff also has failed to demonstrate that he would have timely completed performance, but for the alleged inclement weather. Although Mr. Jackson indicated that if it had rained, he would have indicated that in the daily reports, only three of the daily reports indicate rain, and none of those indicate the severity of the rain. Lt. Adler testified to this point at the trial:

Q [MR. IRVING] And do you recall how many days the project was late?

A [LT. ADLER] It was 15 days.

Q And liquidated damages were ultimately assessed for that tardiness?

A Yes.

Q Was rain ever given as an excuse for delay in performance during your tenure as ROICC on the contract?

A Never during the course or the only time I heard it rain was just in the last week when I saw the latest court documents. But during the course of the contract it was, rain was never an issue.

The government acted in good faith in trying to accommodate the contractor and to provide the contractor the necessary time to perform the contract by November 7, 1991. Plaintiff, however, failed to perform within the allotted time. In accordance with the contract, liquidated damages were assessed for the late completion of performance. This court finds plaintiff's allegations of rain delays to be unsupported in the record. Moreover, plaintiff has demonstrated no evidence to support his argument that the liquidated damages clause in this contract was unreasonable. The government properly assessed the liquidated damages, in accordance with the governing contract provision, at $50.00 per day for fifteen (15) days, totalling $750.00.

■ Finally, although not addressed at the trial, plaintiff included a prayer for relief in his complaint, which appears to raise the Prompt Payment Act, 31 U.S.C. § 3901, *et seq.* (1994). The Prompt Payment Act requires that an agency acquiring property or services from a business, which does not pay the business for each completed or delivered item of property or service by the required due date, shall pay interest on the payment due. The provision states as follows:

(a) Under regulations prescribed under section 3903 of this title, the head of an agency acquiring property or service from a business concern, who does not pay the concern for each complete delivered item of property or service by the required payment date, shall pay an interest penalty to the concern on the amount of the payment due. The interest shall be computed at the rate of interest established by the Secretary of the Treasury, and published in the Federal Register, for interest payments under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611), which is in effect at the time the agency accrues

**45**

the obligation to pay a late payment interest penalty.

31 U.S.C. § 3902(a).

What plaintiff fails to recognize, however, is that the Prompt Payment Act does not apply to the situation presented by this case, primarily because the payment in question here is disputed. Section 3907 states that the Prompt Payment Act does not apply to disputed payments:

> (c) Except as provided in section 3904 of this title, this chapter does not require an interest penalty on a payment that is not made because of a dispute between the head of an agency and a business concern over the amount of payment or compliance with the contract. A claim related to the dispute, and interest payable for the period during which the dispute is being resolved, is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601 et seq.).

31 U.S.C. § 3907(c).

The legislative history of the Prompt Payment Act makes this even more clear in stating that "[t]he act's protections apply only when there is no dispute relating to a contractor's performance. . . . If a dispute exists, a contractor is not entitled to payment or late payment interest penalties until the dispute is resolved. . . . If a contractor prevails under its claim filed under the Contract Disputes Act, interest is to be paid pursuant to that act." H.R.Rep. No. 784, 100th Cong., 2d Sess. 11 (1988), *reprinted in* 1988 U.S.Code Congressional & Admin. News 3036, 3039.

In alleging that the government failed to promptly and properly pay plaintiff amounts invoiced, the plaintiff fails to acknowledge that he had initially agreed to a lump-sum payment, which required full payment upon completion of the work. When Mr. Jackson indicated that he preferred progress payments at the March 6, 1991 meeting, he was instructed by the contracting officer on the invoicing procedures necessary to receive progress payments. The invoicing procedures were also discussed at the March 29, 1990 pre-construction meeting. Despite the parties' discussions on this topic, plaintiff routinely failed to comply with the required invoicing procedures necessary to ensure prompt progress payments. Plaintiff, now, seeks interest on payments that he alleges were untimely.

Plaintiff asserts that he is owed interest on the payment of $8,790.84, which was invoiced on August 28, 1991. Payment for that invoice was made on September 5, 1991. Plaintiff believes that payment on September 5, 1991, for an invoice dated August 28, 1991 is untimely. In light of plaintiff's original contract for a lump sum payment, his failure to comply with proper invoicing procedures, and the fact that the government paid within a reasonable time after the invoice was received, this court disagrees.

Plaintiff also alleges he is owed interest on a payment of $900.00, invoiced on September 30, 1991, but which defendant withheld for one month because of missing reports and payroll for August. Again, plaintiff had been informed at the pre-construction meeting that payments would be withheld for missing daily reports. Therefore, because the payment was withheld due to the plaintiff's failure to comply with the invoicing procedures, the court finds this payment also to have been timely made.

Plaintiff further alleges he is owed interest on $3,750.00, withheld from the December 2, 1991 invoice. Final payment of that invoice was made on December 6, 1993, in the amount of $3,000.00. Initially, the government had withheld $1,000.00 for failure to correct punchlist items, $750.00 for liquidated damages, $1,000.00 for failure to provide as-built drawings, and $1,000.00 for failure to conduct contractually required system testing. The government made the final payment, minus the $750.00 for liquidated damages, without requiring plaintiff to complete the punchlist items and perform the contractually required balance and testing of the system.

Based on the evidence in the record, this court believes that plaintiff was timely paid and the monies retained by the defendant were withheld properly. Moreover, plaintiff's reliance on the Prompt Payment Act is inappropriate, and provides no support for plaintiff's allegations. Finally, with the ex-

46

ception of the $750.00 withheld for liquidated damages, all of plaintiff's invoices were fully paid, despite plaintiff's failure to comply with proper invoicing procedures, despite plaintiff's consistent delays in performance, despite plaintiff's failure to address the remaining punchlist items, and despite plaintiff's failure to conduct the required testing and balancing of the air conditioning system at issue. In total, plaintiff was paid $25,300.00 out of a total contract amount of $26,050.00. The only deduction was for the liquidated damages, appropriately assessed for delays in performance. Plaintiff's claim for interest, as well as his claim for the $750.00 assessed for liquidated damages, must be denied.

## CONCLUSION

After a review of the testimony provided at trial, the exhibits introduced to the court, and the relevant law, this court has determined that plaintiff has failed to meet his burden of proof and cannot prevail on any of the claims presented in his complaint. Therefore, the above-captioned case is, hereby, **DISMISSED.** The Clerk of the Court is directed to enter judgment, in favor of the defendant, in accordance with this decision.

**IT IS SO ORDERED.**